**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| INJECTIVE LABS INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. 22-943-WCB |
| | § | |
| XIN WANG, | § | |
| | § | |
| *Defendant.* | § | |
| | § | |
| _____ | | |
| | | |
| XIN WANG, | § | |
| | § | |
| *Third-Party Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| ZHONGHAN "ERIC" CHEN, | § | |
| | § | |
| *Third-Party Defendant.* | § | |
| _____ | | |

## MEMORANDUM OPINION AND ORDER

On July 18, 2022, plaintiff Injective Labs Inc. ("Injective") brought this action for a declaratory judgment against defendant and third-party plaintiff Xin Wang. Dkt. No. 1. On January 17, 2023, Mr. Wang answered and brought multiple counterclaims against Injective and multiple third-party claims against third-party defendant Zhonghan "Eric" Chen. Dkt. No. 20. Injective and Mr. Chen have moved to dismiss most of the counterclaims and third-party claims under Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, the motion is DENIED.

1

## I.    Background

This suit arises out of three agreements entered into between Injective and Mr. Wang relating to Mr. Wang's services as a consultant to Injective.

Injective and Mr. Chen, the Chief Executive Officer of Injective, designed and marketed a "blockchain-based software protocol" that "purports to be an open, interoperable smart contracts platform optimized for decentralized finance applications."[1]   Dkt. No. 20 ¶ 80.   Beginning in approximately December 2019, Mr. Wang provided consulting services to Injective "to aid Mr. Chen in the marketing, development, and financing" of Injective's platform.  *Id.* ¶ 90.  Mr. Wang alleges that he provided those services "in exchange for a share of the INJ [Injective] tokens that were to be generated by the project."  *Id.*

In the course of their business relationship, Mr. Wang and Injective entered into three agreements:  (1) a consulting agreement dated December 13, 2019 ("the Consulting Agreement"); (2) a Simple Agreement for Future Tokens ("SAFT") dated April 1, 2020; and (3) a SAFT dated April 22, 2020.  *Id.* ¶ 95.  According to the terms of the Consulting Agreement, Injective agreed to procure a "right to purchase 8,000,000 [INJ] Tokens" for Mr. Wang in exchange for his consulting services, subject to Mr. Wang's completion of certain "milestones" to Injective's satisfaction.  Dkt. No. 29-2 § 2; Dkt. No. 29-2, Exh. A § 2.  The milestones required Mr. Wang to "make introductions to and assist in the acquisition of customers, strategic partners and key industry contacts and facilitate and attend meetings with such potential customers, partners and key contacts," and to undertake "[a]ny other projects or tasks relevant to the goals of the Company as discussed and mutually agreed

---

[1]  Unless otherwise indicated, the facts described in this section are recited as they are alleged in Mr. Wang's pleading containing his answer, counterclaims, and third-party claims.  Dkt. No. 20. For purposes of this motion to dismiss Mr. Wang's counterclaims and third-party claims, the factual allegations in the counterclaims and third-party claims are taken as true.

upon" by the parties "to satisfy the needs of fundraising, product development, and go-to-market adoption." Dkt. No. 29-2, Exh. A § 1. The agreement further specified that the company "expects regular weekly communication" with Mr. Wang. *Id.*

A separate provision of the Consulting Agreement states that the issuance of the 8,000,000 tokens "may be contingent upon issuances and other actions by a third party entity that the Company may contract with, and the Company cannot guarantee that it will enter into any contract with such third-party entity, that it will control that entity, or that it will be able to compel such third party entity to comply with the terms" of the Consulting Agreement. *Id.* § 2. The agreement adds, however, that Injective "will take commercially reasonable measures to ensure that the Token Issuer will comply with the provisions of this Agreement." *Id.*

Under the two SAFTs, Mr. Wang agreed to pay Injective a total of $80,000 in exchange for the right to "automatically" receive 444,444.44 INJ tokens paid in installments following a "Qualifying Token Sale."[2] Dkt. No. 20 ¶¶ 97, 99; Dkt. No. 20-1, Exh. 1 § 1(a); Dkt. No. 20-1, Exh. 2 § 1(a). Mr. Wang alleges that a Qualifying Token Sale occurred on October 20, 2020, but that Mr. Wang received the equivalent of only 133,333.333 INJ tokens from Injective instead of the 444,444.44 INJ tokens to which he claims he was entitled under the terms of the SAFTs. Dkt. No. 20 ¶¶ 100, 103, 105.

Mr. Wang contends that he is entitled to the 8,000,000 INJ tokens that he asserts should have been provided to him under the terms of the Consulting Agreement and to the remainder of the tokens that he asserts are owed to him under the terms of the SAFTs. In pursuit of that relief, he has pleaded a number of claims: a claim seeking a declaratory judgment that Injective owes him 8,000,000 INT

---

[2] A "Qualifying Token Sale" refers to the first sale of INJ tokens either to the public or to outside investors. Dkt. No. 20-1, Exh. 1 § 2.

tokens under the Consulting Agreement ("Counterclaim 1"); a claim against Injective for breach of the SAFTs ("Counterclaim 2"); a claim against Injective for breach of the Consulting Agreement ("Counterclaim 3"); a claim against Injective for breach of the implied duty of good faith and fair dealing under the Consulting Agreement ("Counterclaim 4"); a claim against Injective for breach of the implied duty of good faith and fair dealing under the SAFTs ("Counterclaim 5"); a claim against Mr. Chen for conversion of the 8,000,000 INT tokens allegedly owed to Mr. Wang under the Consulting Agreement ("Counterclaim 6"); a claim against Injective and Mr. Chen for civil theft of the 8,000,000 INT tokens allegedly owed to Mr. Wang under the Consulting Agreement ("Counterclaim 7"); a claim of unjust enrichment against Injective relating to the Consulting Agreement ("Counterclaim 8"); and a claim of breach of fiduciary duty against Mr. Chen ("Counterclaim 9").

## II.   Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a complaint should be dismissed if it "fail[s] to state a claim upon which relief can be granted." The Third Circuit has instructed district courts to conduct a "two-part analysis" in evaluating a motion to dismiss for failure to state a claim. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, the district court must separate the factual and legal elements of the claims. *Id.* That is, the court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Id.* at 210–11. Second, the court "must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

### III.   Discussion

Injective and Mr. Chen move to dismiss Counterclaims 1 and 3–9 for failure to state a claim upon which relief can be granted.  I address each of those claims below, along with the issue of the court's subject matter jurisdiction over the claims against Mr. Chen.

### A.   Subject Matter Jurisdiction

I begin by addressing the court's subject matter jurisdiction over Mr. Wang's third-party claims against Mr. Chen.  Mr. Wang's third-party complaint states that the jurisdictional basis over those claims is 28 U.S.C. § 1367, which provides for supplemental jurisdiction over claims for which the court does not independently possess subject matter jurisdiction.  Dkt. No. 20 ¶ 74.  On April 5, 2023, I asked the parties to brief the issue of the court's subject matter jurisdiction, Dkt. No. 33, in light of the allegation in the defendant's counterclaims that Mr. Wang and Mr. Chen are both citizens of a foreign state, Dkt. No. 20 ¶¶ 69, 71.

In response to the court's order, the parties represented that Mr. Chen is actually a United States citizen.  Dkt. No. 35 at 2; Dkt. No. 36 at 2.  It is well settled that diversity jurisdiction lies over claims between "citizens of a State and citizens or subjects of a foreign state" when the amount in controversy exceeds $75,000.  28 U.S.C. § 1332(a)(2); *see also Ethypharm S.A. France v. Abbott Lab'ys*, 707 F.3d 223, 231 n.14 (3d Cir. 2013).  Accordingly, the requirements of section 1332 are independently satisfied by Mr. Wang's third-party claims.  In any event, a district court has supplemental jurisdiction "over a defendant's counterclaim against non-diverse parties joined as third-party defendants to the counterclaim."  *Dev. Fin. Corp. v. Alpha Hous. & Health Care, Inc.*, 54 F.3d 156, 160 (3d Cir. 1995); *see also* 13D Charles Alan Wright et al., Federal Practice and Procedure § 3567.2 (3d ed., April 2023 update).  The court therefore has subject matter jurisdiction over the claims against Mr. Chen.

5

## B.   Counterclaims 1, 2, and 9

Mr. Wang explains in his brief that he has agreed to withdraw Counterclaims 1 and 9 and does not oppose their dismissal.  Dkt. No. 32 at 1 n.1.  Accordingly, those counterclaims will be dismissed at Mr. Wang's behest.  For purposes of this motion, Injective has not challenged Counterclaim 2, so that claim is not addressed in this order.  That leaves Counterclaims 3 through 8, which are discussed below.

## C.   Counterclaim 3

Counterclaim 3 is a claim against Injective for breach of the Consulting Agreement.  Mr. Wang alleges that the Consulting Agreement required Injective to provide him with 8,000,000 INJ tokens "for free or nominal value," as compensation for his consulting services.  Dkt. No. 20 ¶ 140.  Injective argues that the Consulting Agreement contains no such requirement, and that Mr. Wang therefore has not plausibly alleged a breach of that agreement.  Dkt. No. 29 at 5–7.

The Consulting Agreement contains a choice-of-law provision stating that the agreement is governed by California law.  Dkt. No. 29-2 § 9.5.  Under California law, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful."  Cal. Civ. Code § 1636.  The intent of the parties "is to be inferred, if possible, solely from the written provisions of the contract."  *Powerine Oil Co. v. Superior Ct.*, 118 P.3d 589, 598 (Cal. 2005), *as modified* (Oct. 27, 2005) (citation omitted).  That is, "[i]f contractual language is clear and explicit, it governs."  *Id.* (citation omitted).  Courts may consider evidence extrinsic to the contractual language itself if "a mistake or imperfection of the writing is put in issue by the pleadings" or if that evidence can be used "to explain an extrinsic ambiguity or otherwise interpret the terms of the agreement."  Cal. Civ. Proc. Code § 1856(e), (g).  The court "will not strain to create an ambiguity where none exists."  *Deere & Co. v. Allstate Ins.*

6

*Co.*, 244 Cal. Rptr. 3d 100, 111 (Cal. App. 2019), *as modified on denial of reh'g* (Mar. 26, 2019). But if the court concludes that the terms of a promise are ambiguous or uncertain, the contract "must be interpreted in the sense in which the promisor believed, at the at the time of making it, that the promisee understood it." Cal. Civ. Code § 1649.

The relevant portion of the Consulting Agreement states as follows: "As sole and exclusive compensation for the [consulting] Services provided herein, [Injective] shall procure from the Token Issuer [Mr. Wang's] right to purchase 8,000,000 [INJ] Tokens ("Advisor Tokens") from the Token Issuer." Dkt. No. 29-2, Exh. A § 2. By its express terms, the agreement appears to commit Injective to give Mr. Wang the right to purchase the 8,000,000 INJ tokens, i.e., an option to purchase the tokens. *Id.* The interpretation of the agreement as conveying an option to Mr. Wang is reinforced by language in section 2 of Exhibit A to the Consulting Agreement, which requires that "[i]n connection with the issuance of Advisor Tokens, [Mr. Wang] will execute and deliver to the Token Issuer all transaction documents related to such purchase of Advisor Tokens." *Id.* Consistent with that interpretation, Injective argues that by its terms the Consulting Agreement does not require Injective to provide 8,000,000 INJ tokens to Mr. Wang, but merely requires Injective to grant Mr. Wang the "right to purchase" those tokens upon Mr. Wang's providing the relevant transaction documents to the Token Issuer, and that because Mr. Wang has not exercised his option in the manner required by the Consulting Agreement, Injective has not breached the agreement.

Mr. Wang interprets the Consulting Agreement differently. He contends that the Consulting Agreement requires Injective to transfer 8,000,000 INJ tokens to him for free or for a nominal price. Dkt. No. 32 at 8–9. He acknowledges that "there is nothing in the contract language to specify any means of determining what price Mr. Wang is entitled to 'purchase' the tokens." *Id.* at 8. However, he notes that in the absence of an express price term, courts can infer a price term based on factors

such as the parties' intent and industry custom.  *Id.* at 8 (citing *Cal. Lettuce Growers v. Union Sugar Co.*, 289 P.2d 785, 790 (Cal. 1955)).  Mr. Wang contends that the tokens should have been provided to him for free or for a nominal price, because that arrangement for paying consultants was a standard practice in the cryptocurrency industry.[3]  Mr. Wang further alleges that Injective entered into similar agreements with "other project consultants who were subsequently compensated by receiving Advisor Tokens at no or nominal cost."  Dkt. No. 120 ¶ 136.

Mr. Wang does not specifically allege in his pleading that he attempted to purchase the INJ tokens or that he was told the price for the tokens would be greater than a nominal amount.  *See id.* ¶ 123.  Nor has he alleged that he was dissuaded from exercising his option to purchase the tokens because the price Injective asked for the tokens was inconsistent with the parties' understanding when they entered into the Consulting Agreement.  In the hearing on the motion to dismiss, however, counsel for Mr. Wang contended that he has made repeated requests that Injective provide him the tokens as promised.

To the extent that Injective is suggesting that Mr. Wang would have to pay the market price for the tokens, Mr. Wang responds that to accept Injective's interpretation of the Consulting Agreement would require the court to "accept the irrational premise that Mr. Wang agreed to perform work under the contract in exchange for being granted the already freely available 'privilege' of paying money to [Injective]."  *Id.* at 9.  To be sure, California courts recognize contracts for the

---

[3] Injective argues that to the extent Mr. Wang bases his claim on ambiguity in the Consulting Agreement, he has waived that argument by not pleading ambiguity in his answer and counterclaims. There is no waiver here, for two reasons.  First, Mr. Wang's principal argument is that the Consulting Agreement must be construed as he proposes.  To the extent he relies on ambiguity, his argument is that parol evidence may be consulted to support his construction of the agreement, a point that was not necessary to include in his pleading.  Second, a court may conclude that a contract is ambiguous even in the absence of such a pleading by either party.  *In re Newell Indus., Inc.*, 336 F.3d 446, 449 n.5 (5th Cir. 2003).

option to purchase property in the future as valid.  *See, e.g.*, *Price v. 7-Eleven, Inc.*, No. B212597, 2009 WL 4068607, at *5 (Cal. Ct. App. Nov. 25, 2009) (describing an option contract as forming when "one party, in exchange for consideration, agrees to sell property to another party, who retains the option to purchase the property or not"); *Smith v. Bangham*, 104 P. 689, 690–91 (Cal. 1909) (recognizing the enforceability of a contract for the option to purchase land).  The consideration given for such options is frequently more than "merely nominal" and can often be a "very substantial amount."  3 Arthur L. Corbin, Corbin on Contracts § 11.7 (Matthew Bender ed. Nov. 2022).

However, without any assurance that Mr. Wang would be able to obtain the 8,000,000 INJ tokens for free or for a favorable price, it is not clear, based on the materials presented to the court on the motion to dismiss, that the right to purchase the tokens would have had any value at all. Injective contends that the INJ tokens were a scarce asset, *see* Dkt. No. 20 ¶ 141, and therefore Mr. Wang would have viewed the opportunity to purchase 8,000,000 INJ tokens, even at the market price, as having significant value.  Mr. Wang disputes that proposition, arguing that a right to purchase INJ tokens at the market price was of "zero additional value to Mr. Wang."  *Id.* ¶ 126. Moreover, if the right to purchase the tokens were valueless, the contract would be void for want of consideration.  *See id.* ¶ 208 (alleging that Injective "receiv[ed] the consulting services provided by Mr. Wang under the Consulting Agreement without consideration").  The lack of clarity regarding the issue of price thus undermines Injective's position that the Consulting Agreement was sufficiently clear and unambiguous that Mr. Wang's claim based on that agreement should be dismissed at this point in the litigation.

A further problem for Mr. Wang, alluded to by Injective, is that the Consulting Agreement states that the creation and issuance of the tokens is expressly contingent on "actions by a third party entity," presumably the token issuer, that Injective may contract with.  Dkt. No. 29-2, Exh. A § 2.

That statement is qualified, however, by the statement that Injective "will take commercially reasonable measures to ensure that the Token Issuer will comply with the provisions of this Agreement." *Id.* In light of the obligation for Injective to take reasonable measures to ensure that the token issuer acts consistently with Injective's obligations under the agreement, Mr. Wang's claim cannot be dismissed on the ground that it is subject to the unrestricted discretion of a third party.

In the alternative, Mr. Wang argues that the contract should be reformed due to mutual mistake to reflect the parties' actual agreement that "Mr. Wang would provide consulting services in exchange for INJ Tokens in accordance with standard industry practices." Dkt. No. 32 at 9–10. It is generally true that "[i]n determining whether there has been a mutual mistake, the court may consider parol evidence" to "divine the true intentions of the contracting parties and determine whether the written agreement accurately represents those intentions." *Thrifty Payless, Inc. v. The Americana at Brand, LLC*, 160 Cal. Rptr. 3d 718, 729 (Cal. App. 2013) (citation omitted). A party claiming that there was a mutual mistake in a contract "must allege facts showing how the mistake was made, whose mistake it was, and what brought it about, so that the mutuality may appear." *Komorsky v. Farmers Ins. Exch.*, 245 Cal. Rptr. 3d 623, 635 (Cal. App. 2019), *as modified on denial of reh'g* (Mar. 29, 2019).

Mr. Wang's allegations are not detailed with respect to each of those points. He does, however, note that "English is not Mr. Wang's native language" and that "Mr. Wang had no input in the[] wording" of the Consulting Agreement, which was provided to him by Mr. Chen. Dkt. No. 20 ¶ 125. Mr. Wang also asserts that the parties agreed that Mr. Wang would be entitled to "purchase 8,000,000 INJ tokens for no or nominal value," as is allegedly the "standard industry practice." *Id.* ¶ 123. Those allegations, construed in the light most favorable to Mr. Wang, suggest the circumstances that gave rise to the alleged mistake. Accordingly, while Mr. Wang's pleadings on

the issue of mutual mistake are lacking in detail, the assertion that the parties intended for the Consulting Agreement to provide Mr. Wang with the right to purchase the 8,000,000 INJ tokens for a nominal price is sufficient for purposes of Injective's motion to dismiss to allege that the consideration provision of the Consulting Agreement reflected a mutual mistake as to the parties' intentions.

In sum, Mr. Wang's allegations are sufficient to plead his construction of the Consulting Agreement or, in the alternative, that the consideration clause in the Consulting Agreement was the product of a mutual mistake. Counterclaim 3 is therefore sufficient to state a claim on which relief can be granted, and therefore will not be dismissed.

### D.   Counterclaim 4

Counterclaim 4 is a claim against Injective for breach of the implied duty of good faith and fair dealing with respect to the Consulting Agreement. The implied duty of good faith and fair dealing is "implied by law in every contract," and it serves "as a supplement to the express contractual covenants, to prevent a party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract." *Thrifty Payless*, 160 Cal. Rptr. 3d at 729–30 (citations omitted). The implied duty may not be invoked, however, to override the express terms of the contract. *See Wolf v. Walt Disney Pictures & Television*, 76 Cal. Rptr. 3d 585, 597 (Cal. App. 2008), *as modified on denial of reh'g* (June 4, 2008).

With respect to the Consulting Agreement, Mr. Wang's arguments largely mirror his arguments regarding Counterclaim 3. For example, he argues that Injective's interpretation of the "right to purchase" language in the Consulting Agreement "render[s] the parties' contract worthless." Dkt. No. 32 at 12. He also argues that Injective has adopted a "bad faith interpretation" of the Consulting Agreement under which Injective "need never deliver [the INJ tokens] at all." *Id.*

11

If the Consulting Agreement is ultimately construed in the manner urged by Mr. Wang, the agreement will control the issue of Mr. Wang's right to purchase the tokens for a particular price. On the other hand, if the contract is construed as Injective proposes, Mr. Wang's rights will be defined by the contract and not by the implied duty of good faith and fair dealing.  However, if it is ultimately determined that the Consulting Agreement is ambiguous with respect to price, it is possible that the agreement will be construed in a way that favors Mr. Wang and that Injective's conduct with regard to its responsibilities under the agreement could be found to violate the implied duty of good faith and fair dealing.  Any such determination must await the ultimate ruling as to the parties' rights and responsibilities under the Consulting Agreement.  Accordingly, Counterclaim 4 will not be dismissed at this time.

### E.    Counterclaim 5

Counterclaim 5 is a claim against Injective for breach of the implied duty of good faith and fair dealing with respect to the SAFTs.  Unlike the Consulting Agreement, the choice-of-law provisions in the SAFTs provide that those agreements are to be interpreted under Delaware law. Dkt. No. 20-1, Exh. 1 § 6(h); *id.*, Exh. 2 § 6(h).  As in California, the implied duty of good faith and fair dealing under Delaware law "inheres in every contract" and "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009) (cleaned up).  Also, as in California, the implied duty of good faith and fair dealing under Delaware law "cannot be invoked to override the express terms of the contract." *Id.*

Mr. Wang alleges that "Injective was bound by an implied contractual obligation to release 444,444.44 INJ tokens to Mr. Wang in three tranches in accordance with the release schedule under

the SAFTs." Dkt. No. 20 ¶ 176. Mr. Wang further alleges that Injective "wrongfully withheld" 311,111.11 INJ tokens that were due under the SAFTs because, in Injective's view, Mr. Wang had "attempted to resell his INJ tokens or future rights to INJ tokens." *Id.* ¶ 177. Mr. Wang also raises the separate contention that Injective "wrongfully accused Mr. Wang of failing to complete the KYC [know your customer] and AML [anti-money laundering] information request as a condition precedent to receipt of the tokens." *Id.* ¶ 179.

With respect to the allegations of attempted reselling, the express terms of the SAFTs require that Mr. Wang not offer to sell or sell any of the "Future Token Rights" or "Tokens" provided to him under the SAFTs for certain specified periods of time. Dkt. No. 20-1, Exh. 1 § 4(b)(ii); *Id.*, Exh. 2 § 4(b)(ii). Essentially, Injective's contention is that Mr. Wang breached the SAFTs by impermissibly transferring the tokens he had already received from Injective, and therefore Injective was not required to provide him with the remaining tokens that were due under the SAFTs. Dkt. No. 1 ¶¶ 20–25. The question whether the alleged breach by Mr. Wang is one that excused Injective from its obligation to deliver the remaining tokens owed to Mr. Wang can be resolved through adjudication of Counterclaim 2 (for breach of the SAFTs). It does not implicate the implied duty of good faith and fair dealing.

With respect to the KYC and AML information, the SAFTs included a condition precedent that required Mr. Wang to "complete and deliver all AML and KYC Forms requested by [Injective]." Dkt. No. 20-1, Exh. 1 § 1(b)(ii)(iv); *Id.*, Exh. 2 § 1(b)(ii)(iv). Mr. Wang alleges that Injective did not ask him to fill out any AML or KYC forms prior to delivering him the first tranche of tokens due under the SAFTs. In fact, according to Mr. Wang, Injective did not ask him to complete those forms until March 15, 2022, "after Mr. Wang expressed his intention to seek redress before this Court." Dkt. No. 20 ¶¶ 111–12. Mr. Wang further alleges that when Injective sent him a KYC screening

request, Mr. Wang was unable to complete the process because "the service provider . . . refused any Chinese citizen from completing the process." *Id.* ¶ 113. According to Mr. Wang, Injective "knew this proposed KYC process would not be [accessible] to Mr. Wang." *Id.*

Mr. Wang argues that Injective breached the implied duty of good faith and fair dealing by sending a belated request that Mr. Wang satisfy a condition precedent, knowing that it was effectively impossible for him to do so. Dkt. No. 32 at 11–12. That allegation, and in particular the allegation that Injective knew that Mr. Wang would be unable to satisfy the condition precedent because the KYC screening provider was not accessible to him, is directed to the type of conduct that typically falls within the scope of the implied duty of good faith and fair dealing. Specifically, it is not an express term of the contract that the AML and KYC forms be accessible to Mr. Wang, but the allegation that Injective chose a provider that was inaccessible to Mr. Wang is an allegation that Injective engaged in "arbitrary or unreasonable conduct which ha[d] the effect of preventing the other party to the contract from receiving the fruits of the bargain." *See Kuroda*, 971 A.2d at 888; *see also Benerofe v. Cha*, No. 14614, 1998 WL 83081, at *6 (Del. Ch. Feb. 20, 1998) ("[I]t is possible to rest a claim of breach of the implied covenant of good faith and fair dealing on the assertion that defendants have deliberately prevented the occurrence of conditions precedent . . . ."). Accordingly, Counterclaim 5 will not be dismissed with respect to the condition precedent regarding AML and KYC forms.

**F.   Counterclaim 6**

Counterclaim 6 is a claim against Mr. Chen for conversion of the 8,000,000 INJ tokens that were allegedly owed to Mr. Wang.[4] To state a claim for conversion, a plaintiff must allege three

---

[4] Mr. Wang does not specify whether Delaware or California law applies to his tort claims. Injective contended in its opening brief that Delaware law governs all those claims. Dkt. No. 29 at

elements:  (1) the plaintiff "has a property interest in the allegedly converted property"; (2) the plaintiff "had a right to possession of the property"; and (3) the defendant "wrongfully possessed or disposed of such property as if it were [his] own." *ESG Cap. Partners II, LP v. Passport Special Opportunities Master Fund, LP*, No. CV 11053-VCL, 2015 WL 9060982, at *15 (Del. Ch. Dec. 16, 2015).

Under his interpretation of the Consulting Agreement, Mr. Wang asserts that he has a property interest in the 8,000,000 INJ tokens, that he has a right to possession of that property, and that Injective has wrongfully possessed or disposed of that property.  Under Injective's interpretation of the contract, Mr. Wang has not plausibly alleged the second element of a claim for conversion, namely, that he "had a right to possession" of the 8,000,000 INJ tokens that he claims were converted by Mr. Chen.  *See id.*  That is because, under Injective's interpretation, the Consulting Agreement did not require Injective (or Mr. Chen) to deliver those tokens to Mr. Wang, but only gave Mr. Wang the right to purchase the tokens.  Based on Injective's contention that Mr. Wang has not actually attempted to purchase the 8,000,000 INJ tokens, Injective argues that Mr. Wang has failed to show that he had a right to possess those tokens.  However, Mr. Wang has adequately pleaded that the Consulting Agreement should be read in the manner he suggests, and under that construction he could be viewed as having a right to possession of the 8,000,000 tokens.  As noted earlier, the questions whether Mr. Wang's interpretation of the contract is correct and whether the contract is

---

11 n.2.  Mr. Wang does not appear to dispute that Delaware law applies to his tort claims, except for his civil theft claim, which he expressly characterizes as arising under California law.  *See* Dkt. No. 32 at 13–16.  In reply, Injective relies on California authorities with respect to the civil theft claim and does not appear to dispute that California law applies to that claim.  *See* Dkt. No. 34 at 8–9.  In any event, it does not appear that the choice of law is dispositive with respect to any of Mr. Wang's claims.  I will therefore treat Mr. Wang's tort claims as arising under Delaware law, except for his civil theft claim, which I will treat as arising under California law in light of the parties' agreement on that point.

void for lack of consideration cannot be answered without further development of the record. Mr. Wang's conversion claim will therefore not be dismissed on that ground.

Injective further argues, Dkt. No. 29 at 12, that Mr. Wang's conversion claim must be dismissed because it is duplicative of his breach of contract claim and that under Delaware law a complaint fails to state a claim for conversion if the claim is duplicative of the plaintiff's breach of contract claim. *See Kuroda*, 971 A.2d at 889. Because it is possible that the Consulting Agreement will be deemed invalid for the reasons stated above, Mr. Wang may be required to rely on his tort and equitable claims as a basis for relief. At present, therefore, it cannot be determined whether his tort claims will be duplicative of his claim for breach of contract. Counterclaim 6 will therefore not be dismissed at this juncture.[5]

### G.   Counterclaim 7

Counterclaim 7 is a claim for civil theft against both Injective and Mr. Chen. Under California law, "theft" is defined to include "defraud[ing] any other person of money, labor or real or personal property." Cal. Penal Code § 484(a). The elements of civil theft are: (1) "property was stolen or obtained in a manner constituting theft"; (2) "the defendant knew the property was so stolen or obtained"; and (3) "the defendant received or had possession of the stolen property." *Siry*

---

[5] Injective also argues in passing that Mr. Wang failed to allege that Mr. Chen engaged in tortious conduct "beyond his role as an officer of Injective." Dkt. No. 34 at 7. However, the Delaware Court of Chancery recently addressed a similar situation in *Malca v. Rappi, Inc.*, No. CV 2020-0152-MTZ, 2021 WL 2044268, at *5–6 (Del. Ch. May 20, 2021). In that case, the plaintiff brought a breach of contract claim against an officer of a corporation, and a conversion claim alleging similar conduct against both the officer and the corporation. *Id.* at *3. In denying the defendants' motion to dismiss the conversion claim, the court held that a "nonduplicative, alternative tort claim" could exist against both the officer and the corporation. *Id.* at *5. Specifically, the court noted, the plaintiff's conversion claim against the officer did not "arise solely from a breach of contract," because the contract may have "lack[ed] material terms." *Id.* Likewise, the court observed that there was no "overlapping breach of contract claim" against the corporation, which was not party to the contract that related to the dispute. *Id.* at *5 & n.46.

*Investment, L.P. v. Farkhondehpour*, 513 P.3d 166, 179 (Cal. 2022).  Importantly, however, "not all commercial or consumer disputes alleging that a defendant obtained money or property through fraud, misrepresentation, or breach of a contractual promise will amount to a theft."  *Id.* at 184.  To ensure that "[o]rdinary commercial defaults" are not "transformed into a theft," California law requires that a plaintiff alleging civil theft must "establish criminal intent on the part of the defendant beyond 'mere proof of nonperformance or actual falsity.'"  *Id.* (quoting *People v. Ashley*, 267 P.2d 271, 282–83 (Cal. 1954)).  In particular, a civil theft claim does not lie if the defendant "has a good faith claim of right to possession."  *Best Fresh LLC v. Vantaggio Farming Corp.*, No. 3:21-cv-00131, 2022 WL 4112231, at *8 (S.D. Cal. Sept. 8, 2022) (cleaned up).

Mr. Wang alleges that Injective and Mr. Chen "knowingly and intentionally assumed control over Mr. Wang's INJ tokens and feloniously stole, took, misappropriated, and drove away such INJ tokens."  Dkt. No. 20 ¶ 198.  With respect to the Consulting Agreement, Mr. Wang alleges that Injective and Mr. Chen "knowingly and intentionally deprived Mr. Wang of [the] 8,000,000 INJ tokens" owed to him under the Consulting Agreement when they "refus[ed] without justification to deliver 8,000,000 INJ tokens to Mr. Wang."  Dkt. No. 20 ¶ 199.  Injective responds that it was not obligated to deliver 8,000,000 INJ tokens to Mr. Wang under the Consulting Agreement absent his seeking to exercise his right to purchase them, and that Mr. Wang therefore has not plausibly alleged that Injective or Mr. Chen committed civil theft by failing to deliver those tokens.

With respect to the SAFTs, Mr. Wang alleges that Injective "reneged on its contractual obligation to deliver the INJ tokens due to Mr. Wang under the SAFTs" and that "Injective and Mr. Chen also deprived him of the benefit of owning such INJ tokens because they misappropriated, commingled, or misapplied such INJ tokens" by, inter alia, "[e]mbezzling proceeds from sales of

allocations of the INJ tokens owed to Mr. Wang; and Embezzling the INJ tokens owed to Mr. Wang." *Id.* ¶ 201.

For purposes of the motion to dismiss, Mr. Wang's allegations are sufficient to state a claim of civil theft. That is, the allegations of purposeful theft, misappropriation, and embezzlement constitute more than a claim of an "[o]rdinary commercial default" that can be addressed through a breach of contract claim. *See Siry Investment*, 513 P.3d at 184 (citation omitted); *see also People v. Hartley*, 203 Cal. Rptr. 3d 770, 778–79 (Cal. App. 2016) (requiring evidence of an "intent to defraud" to turn a claim of a "transaction-gone-bad" into one of theft). As to the claim by Injective and Mr. Chen that they had a "good faith claim of right to possession" of the tokens at issue in this case based on their interpretation of the agreements with Mr. Wang, their claim of good faith is squarely contrary to Mr. Wang's allegations in his counterclaims and third-party claims. That dispute cannot be resolved on the present motion.

Injective and Mr. Chen raise a second ground for dismissal of Mr. Wang's civil theft counterclaim, arguing that Mr. Wang has failed to allege that the INJ tokens at issue "were ever his personal property." Dkt. No. 29 at 14. Because Mr. Wang does not allege that he was ever "in possession of" the INJ tokens, Injective and Mr. Chen contend that he cannot maintain a claim for civil theft of the tokens. In fact, however, California law does not require a victim to have physical possession of property prior to the wrongful conduct that is alleged to constitute civil theft. It is enough that the defendant has diverted funds or other property to which the plaintiff has a valid claim of entitlement. *See Siry Investment*, 513 P.3d at 184 (fraudulent diversion of partnership funds held to constitute civil theft); *Switzer v. Wood*, 247 Cal. Rptr. 3d 114, 117 (Cal. App. 2019) (withholding joint venture proceeds held to constitute civil theft). Counterclaim 7 therefore will not be dismissed.

### H.   Counterclaim 8

Counterclaim 8 is a claim of unjust enrichment against Injective as to the Consulting Agreement.  Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999) (citation omitted).  Mr. Wang alleges that "Injective unjustly enriched itself by receiving the consulting services provided by Mr. Wang under the Consulting Agreement without consideration."  Dkt. No. 20 ¶ 208.

While it is true that "the existence of an express, enforceable contract that controls the parties' relationship will defeat an unjust enrichment claim[]," *Tolliver v. Christina Sch. Dist.*, 564 F. Supp. 2d 312, 315 (D. Del. 2008), it is also the case that a claim of unjust enrichment may survive despite the existence of a contract "when the validity of the contract is in doubt or uncertain." *Id.*  In this case, as discussed above, it is possible that the Consulting Agreement will be deemed void for lack of consideration.  Dkt. No. 32 at 16.  If that should be so, Mr. Wang's claim of unjust enrichment would become cognizable, as a potential vehicle for compensating him for work done under the reasonable belief that he would be compensated and that Injective would not obtain the benefit of his services without compensation.  For that reason, Mr. Wang's claim of unjust enrichment will not be dismissed.

### IV.   <u>Conclusion</u>

In summary, the motion to dismiss is DENIED as to Counterclaims 3, 4, 5, 6, 7, and 8. Counterclaims 1 and 9 have been withdrawn by Mr. Wang and will be treated as dismissed.

IT IS SO ORDERED.

SIGNED this 9th day of May, 2023.


_____
WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE