

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

XIN WANG,                                          §
                                                   §
        *Plaintiff,*                               §
                                                   §
v.                                                 §          No. 22-943
                                                   §
INJECTIVE LABS INC. and ZHONGHAN                   §          **FILED UNDER SEAL**
"ERIC" CHEN,                                        §
                                                   §
        *Defendants.*                              §
_____

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Xin Wang brought this case against defendants Injective Labs, Inc., and Zhonghan "Eric" Chen (collectively, "Injective"). Mr. Wang has now moved for summary judgment that Injective breached each of three agreements with him and that he is entitled to damages as a result. Dkt. No. 159. Mr. Wang's motion is denied. Mr. Wang has also moved to exclude various opinions of Injective's experts under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and Federal Rule of Evidence 702. Dkt. No. 160. That motion is granted in part and denied in part.

Injective has filed a cross-motion for summary judgment that Mr. Wang breached each of the three agreements, that he cannot prove damages even in the event of a breach by Injective, that his claims are barred by the doctrine of unclean hands, and that he has failed to raise a triable issue as to his claims of conversion, civil theft, or unjust enrichment. Dkt. No. 157. Injective's motion is granted in part and denied in part. Injective has also moved to exclude various opinions of Mr. Wang's experts under *Daubert* and Federal Rule of Evidence 702. Dkt. No. 155. That motion is granted in part and denied in part.

1

## I.     BACKGROUND

The claims in this case arise from three contracts between Mr. Wang and Injective.  In 2019, Injective was a startup company operating in the cryptocurrency industry.  Injective was looking for investors, so it hired Mr. Wang as a consultant to identify Chinese investors and customers.  The agreement for Mr. Wang to work as a consultant for Injective was memorialized in a consulting agreement dated December 13, 2019.  Dkt. No. 158-3 ("Consulting Agreement"). In the course of their business relationship, Injective and Mr. Wang entered into two other agreements known as "simple agreements for future tokens" ("SAFTs").  The first SAFT is dated April 1, 2020.  Dkt. No. 158-1 ("1st SAFT").  The second is dated April 22, 2020.  Dkt. No. 158-2 ("2nd SAFT").

### A.     Consulting Agreement

By the terms of the Consulting Agreement, Mr. Wang undertook to "make introductions to and assist in the acquisition of customers, strategic partners and key industry contacts and facilitate and attend meetings with such potential customers, partners and key contacts."   Consulting Agreement, Exh. A ("Statement of Work") at § 1(I).  In exchange, Injective agreed to "procure from the Token Issuer Advisor's right to purchase 8,000,000 Tokens ('Advisor Tokens') from the Token Issuer."  *Id.* at § 2.  The term "Token Issuer" refers to "the foundation or non-profit entity that has entered or will enter into a services contract, agreement, relationship, understanding or arrangement with the Company or any of its affiliates to develop a blockchain protocol and the associated ecosystem."  *Id.*

The Consulting Agreement provides that Mr. Wang "shall not sell, offer to sell, loan, grant any option for the purchase of, make any short sale, or otherwise dispose of any Advisor Tokens until the date that is 6 months after the bona fide release of the Tokens to the general public, as

2

determined by the Token Issuer in its sole discretion." *Id.* The Consulting Agreement further provides that Injective's obligations would be subject to Mr. Wang's completion of certain "milestones" to Injective's "reasonable satisfaction." Consulting Agreement at § 2.1. It does not set the price at which Mr. Wang would purchase the tokens nor does it explicitly set a date by which Mr. Wang would need to complete the purchase. Finally, the Consulting Agreement contains a confidentiality provision, prohibiting Mr. Wang from disclosing Injective's confidential information. *Id.* at § 5.

### B.    SAFTs

Under the SAFTs, Mr. Wang agreed to pay Injective a fixed amount in exchange for "future token rights," which would entitle Mr. Wang to receive tokens at a later date. 1st SAFT at § 1(a); 2nd SAFT at § 1(a). Specifically, based on his payment of the specified sum, the SAFTs gave Mr. Wang "the right (the 'Future Token Rights') to receive, automatically and without any future payment, the number of Tokens equal to the Purchase Amount divided by the Token Conversion Price." 1st SAFT at § 1(a); 2nd SAFT at § 1(a). The SAFTs define "Purchase Amount" to be the amount of the payment Mr. Wang agreed to make. 1st SAFT at 1; 2nd SAFT at 1. The SAFTs define "Token Conversion Price" to be "(i) in the case of a Primary Listing, the Listing Day Opening Price multiplied by the Discount Rate, or (ii) in the case of a Token Sale to Outside Investors, the Lowest Token Sale Price multiplied by the Discount Rate." 1st SAFT at § 2; 2nd SAFT at § 2. As in the Consulting Agreement, the SAFTs contain "lockup" provisions prohibiting Mr. Wang from "[t]ransfer[ring] any Restricted Interests, any options to purchase any Restricted Interests, or any instruments convertible into, exchangeable for, or that represent the right to receive Restricted Interests, including the Future Token Rights acquired herein, whether now or

3

hereinafter acquired by the Investor" for a period of between six months and one year after the token sale.  1st SAFT at § 5(b); 2nd SAFT at § 5(b).

## II.  LEGAL STANDARD

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is genuine and material if a reasonable factfinder could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  On an issue as to which the moving party bears the burden of proof at trial, the party seeking summary judgment must "establish the absence of a genuine factual issue."  *Resol. Tr. Corp. v. Gill*, 960 F.2d 336, 340 (3d Cir. 1992).  If the motion does not persuasively establish that no factual issue exists, summary judgment should be denied "even if no opposing evidentiary matter is presented."  *Id.* Once the moving party with the burden of proof makes a showing that there is no genuine factual issue, that party is entitled to summary judgment "unless the non-moving party comes forward with probative evidence that would demonstrate the existence of a triable issue of fact."  *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson*, 477 U.S. at 250.

For an issue on which the nonmoving party bears the burden of proof at trial, the party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp.*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c) as of 1986).  The burden on the moving party in that situation can be satisfied by "showing," that is, by "pointing out to the district court—that there is an absence of

evidence to support the nonmoving party's case." *Id.* at 325. If the moving party carries its burden, the nonmovant must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (cleaned up).

The admissibility of expert testimony is governed by the Supreme Court's decision in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny. Under *Daubert* and Federal Rule of Evidence 702, the trial court is assigned the task of ensuring that an expert's testimony rests on a reliable foundation and is relevant to the task at hand. *Id.* at 597. In particular, the court must determine whether the reasoning or methodology underlying the expert's testimony is scientifically valid and whether that reasoning or methodology can properly be applied to the facts at issue. *Id.* at 593. The *Daubert* framework applies broadly to "scientific, technical, or other specialized knowledge," and the rules of evidence require the trial judge to determine "whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 149 (1999) (quoting *Daubert*, 509 U.S. at 592).

## III. DISCUSSION

### A. Summary Judgment

The parties have cross-moved for summary judgment regarding breach, with each party arguing that the other party breached the agreements. Both sides devote considerable space in their respective summary judgment motions to the contention that the other side has breached its obligations under the SAFTs and the Consulting Agreement. Mr. Wang focuses on the fact that much of the evidence recited by Injective consists of unsworn allegations, while Mr. Wang's testimony is presented in affidavit form. Injective, for its part, contends that Mr. Wang's sworn testimony is contradicted by record evidence in the case and for that reason his affidavit can be

disregarded as a "sham affidavit." For the reasons given below, I am persuaded that there are triable disputes of fact with respect to the issue of contract breach in this case and that neither side is entitled to summary judgment on that issue.

### 1. Breach of the SAFTs

Mr. Wang alleges that he received only 133,333.333 INJ tokens from Injective instead of the 444,444.44 INJ tokens to which he claims he was entitled under the terms of the SAFTs. Dkt. No. 161 at 7–9. Injective does not dispute the number of tokens that may be obligated to Mr. Wang under the SAFTs. Instead, Injective argues that Mr. Wang cannot recover under the SAFTs because he breached the agreements and has engaged in other misconduct. Dkt. No. 170 at 8.

Injective's first theory of breach is that Mr. Wang improperly sold his interest in his tokens during the lockup period. *Id.* at 9. Pursuant to the SAFTs, Mr. Wang agreed not to "[t]ransfer any Restricted Interests, any options to purchase any Restricted Interests, or any instruments convertible into, exchangeable for, or that represent the right to receive Restricted Interests, including the Future Token Rights acquired herein, whether now or hereinafter acquired by the Investor" for a period of between six months and one year after the token sale. 1st SAFT at § 5(b); 2nd SAFT at § 5(b). Injective cites record evidence suggesting that in October 2019 Mr. Wang solicited and received funds from an individual known as "Hunter" in exchange for an interest in the tokens that Mr. Wang expected to receive from Injective. *See* Dkt. No. 158-6 (offer to purchase tokens); Dkt. No. 158-7 (same); Dkt. No. 158-8 (request for funds); Dkt. No. 158-9 (confirmation of transfer). In response, Mr. Wang offers a sworn declaration, stating that he did not sell any tokens during the lockup period and explaining that the messages with Hunter were about Hunter's investment in Injective, and did not reflect a sale of tokens. Dkt. No. 167. In view of the conflicting

evidence as to whether Mr. Wang sold his interest in the tokens, there is a dispute of material fact as to whether Mr. Wang breached the lockup provisions of the SAFTs.

Injective's next theory of breach is that Mr. Wang breached the SAFTs by providing fraudulent information when completing documentation for Injective.  The SAFTs require Mr. Wang to "complete and deliver all AML [Anti-Money Laundering] and KYC [Know Your Customer] Forms requested by the Company."   1st SAFT at § 1(b)(ii)(iv); 2nd SAFT at § 1(b)(ii)(iv).   Injective cites record evidence suggesting that Mr. Wang uploaded a fake identification card when completing the forms that Injective sent to him.  Dkt. No. 158-23 (photo of identification card); Dkt. No. 158-4 at 176:7–187:15 (testimony about identification card).  Mr. Wang argues that he was unable to upload his Chinese identification card, so his actions did not constitute breach but rather were the result of Injective's "intentional frustration of his ability to comply with the terms of the agreements."  Dkt. No. 172 at 12.  Injective does not respond to that argument.  Given the conflicting evidence as to that issue, the question whether Mr. Wang provided false information, thereby breaching the SAFTs, is a question for the jury.

Because there are disputes of fact as to whether Mr. Wang breached the SAFTs and thereby discharged Injective's obligation to deliver tokens to him, I will deny both Mr. Wang's motion for summary judgment that Injective breached the SAFTs and Injective's motion for summary judgment that Mr. Wang breached the SAFTs.

### 2. Breach of the Consulting Agreement

Mr. Wang argues that Injective breached the Consulting Agreement by withholding tokens to which he was entitled.  Specifically, Mr. Wang explains that the Consulting Agreement granted him the "right to purchase" tokens, and that the parties understood that right to mean that Mr. Wang would be entitled to "free" tokens—i.e., he would not be required to pay Injective anything for

those tokens.  Dkt. No. 161 at 10–12.  Moreover, Mr. Wang argues that Injective failed to make any effort to procure those tokens for him.  *Id.* at 13–14.  Injective's response is that its only obligation under the Consulting Agreement was to procure the right for Mr. Wang to purchase the tokens; Injective asserts that it was not required to give Mr. Wang the tokens for free.  Dkt. No. 170 at 3.  Injective also argues that Mr. Wang breached the Consulting Agreement by failing to identify investors for Injective, seeking to sell his tokens during the lockup period, and disclosing Injective's confidential information.

The first issue is one of contract interpretation: to determine whether Injective was obligated to provide Mr. Wang with the promised tokens for no compensation other than the consulting services he had agreed to perform.[1]  As noted, Mr. Wang argues that Injective was obligated to provide him with free tokens.  Injective argues that Mr. Wang's interpretation of the agreement is contrary to the agreement's plain language.  Dkt. No. 170 at 4.

The Consulting Agreement contains a choice-of-law provision stating that the agreement is governed by California law.  Consulting Agreement at § 9.5.  Under California law, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful."  Cal. Civ. Code § 1636.  The intent of the parties "is to be inferred, if possible, solely from the written provisions of the contract."  *Powerine Oil Co. v. Superior Ct.*, 118 P.3d 589, 598 (Cal. 2005), *as modified* (Oct. 27, 2005)

---

[1] That dispute was originally raised by Injective in a motion to dismiss, in which Injective argued that it was required to grant Mr. Wang only the right to purchase tokens.  Because Mr. Wang never sought to exercise that option, Injective argued that it did not breach the agreement.  I denied that motion, holding that because the Consulting Agreement was unclear regarding the price of the tokens that were the subjects of the option, Mr. Wang's interpretation of the agreement as providing free or nominally priced tokens was plausible under the motion-to-dismiss standard.  Dkt. No. 40 at 6–11.

(citation omitted).  That is, "[i]f contractual language is clear and explicit, it governs." *Id.* (citation omitted).  The plain language of the agreement requires Injective to give Mr. Wang the right to purchase 8,000,000 tokens.  Statement of Work at § 2.  A right to purchase tokens is different from the right to receive free tokens.  Accordingly, Mr. Wang's interpretation is inconsistent with the plain language of the agreement.

Mr. Wang argues that although the agreement uses the phrase "right to purchase," the extrinsic evidence shows that the parties understood the agreement to provide Mr. Wang with the tokens for free.  Dkt. No. 161 at 10–12.  The agreement, however, contains an integration clause.  Consulting Agreement at § 9.9.  That clause provides that the agreement is "the complete and exclusive understanding and agreement of the parties with respect to its subject matter and supersedes all prior understandings and agreements, whether written or oral, with respect to its subject matter." *Id.*  For such agreements, California law provides that parol evidence "cannot be used to add to or vary its terms." *Masterson v. Sine*, 68 Cal. 2d 222, 225, 436 P.2d 561, 563 (1968) (quoting *Pollyanna Homes, Inc. v. Berney*, 56 Cal. 2d 676, 679, 365 P.2d 401, 403 (1961)); *EPA Real Est. P'ship v. Kang*, 12 Cal. App. 4th 171, 175, 15 Cal. Rptr. 2d 209, 213 (1992).[2]  Therefore,

---

[2]  Mr. Wang argues that the California statutory parol evidence rule allows for the use of industry custom and extrinsic evidence to explain and supplement terms of integrated written agreements.  Dkt. No. 174 at 2 n.2 (citing Cal. Civ. Proc. Code § 1856).  Under California law, the terms of an agreement set forth in writing "intended by the parties as a final expression of their agreement with respect to the terms included therein may not be contradicted by evidence of a prior agreement or of a contemporaneous oral agreement," but those terms "may be explained or supplemented by course of dealing or usage of trade or by course of performance." *Id.* § 1856(a), (c).  That language has been interpreted to mean that "course of performance evidence [is] admissible to explain or supplement but not to contradict the terms of an integrated agreement, even when the agreement's written terms are unambiguous." *Lennar Mare Island, LLC v. Steadfast Ins. Co.*, 176 F. Supp. 3d 949, 966 (E.D. Cal. 2016).  In this case, to use extrinsic evidence to construe the term "purchase" to mean "obtain for free" would be an act of contradiction, not

Mr. Wang's extrinsic evidence, such as the communications between the parties or industry custom, *see* Dkt. No. 161 at 10–11, cannot serve as the basis to construe the agreement to create an obligation for Injective to give Mr. Wang tokens without compensation other than his consulting services. Accordingly, Mr. Wang must prove that he sought to purchase the tokens—as was his right under the agreement—and that Injective refused to let him make such a purchase.[3]

Mr. Wang argues that to the extent he had to purchase the tokens, the price for the tokens should have been nominal. Dkt. No. 161 at 11–12, 18. He cites various pieces of extrinsic evidence in support of that argument, including testimony regarding industry custom, *e.g.*, Dkt. No. 161-3 at 337:5–15, and a valuation report, Dkt. No. 161-14 at 5. Injective does not take a position on the appropriate price of the tokens, arguing instead that if price is found to be a material term, then the agreement is simply an unenforceable agreement to agree. Dkt. No. 158 at 14.

Under California law, courts follow a two-step process if a party argues that a contract is ambiguous. "First, the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine 'ambiguity,' i.e., whether the language is 'reasonably susceptible' to the interpretation urged by a party. If in light of the extrinsic evidence the court decides the language is 'reasonably susceptible' to the interpretation urged, the extrinsic

---

simply explanation or supplementation. *See Fifty-Six Hope Road v. Jammin Java Corp.*, No. 2-16-cv-5810, 2017 WL 2457487, at *8 (C.D. Cal. Jan. 25, 2017) ("[C]ourse of conduct evidence cannot flatly contradict a written agreement.").

[3] Mr. Wang alludes in passing to the California version of the Uniform Commercial Code, which defines the term "purchase" to include "gift" or "any other voluntary transaction creating an interest in property." Cal. Com. Code §1201(b)(29). By its terms, however, the California Commercial Code applies to the sale of goods, not to the provision of services. *See Wall St. Network, Ltd. v. New York Times Co.*, 164 Cal. App. 4th 1171, 1186, 80 Cal. Rptr. 3d 6, 19 (2008). The Consulting Agreement is clearly a contract for services, not a contract for the sale of goods, and therefore the definition of the term "purchase" in the California Commercial Code has no application to this case.

evidence is then admitted to aid in the second step—interpreting the contract." *WYDA Assocs. v. Merner*, 42 Cal. App. 4th 1702, 1710, 50 Cal. Rptr. 2d 323, 327 (1996). "Whether a contract is ambiguous is a question of law, but if the contract is ambiguous, any conflicts in the evidence ordinarily cannot be resolved without a trial." *Calamco v. J. R. Simplot Co.*, No. 221CV01201, 2023 WL 4239107, at *4 (E.D. Cal. June 28, 2023).

Here, it is undisputed that the contract does not provide a purchase price for the tokens. In view of Mr. Wang's evidence regarding the valuation report and industry custom, I conclude that the contract is reasonably susceptible to his interpretation that the price for the tokens would be less than market value. *See* Dkt. No. 161-3 at 337:5–15; Dkt. No. 161-14 at 5. But whether the price would be nominal or some greater amount is a question of fact that cannot be resolved on summary judgment. Accordingly, to the extent the purchase price becomes relevant to resolving the issues in this case, the question of price will be put to the jury.

As with the SAFTs, Injective does not expressly dispute that the Consulting Agreement provides for tokens to be delivered to Mr. Wang. Instead, Injective argues that Mr. Wang cannot recover under the Consulting Agreement because he breached the agreement. That is, Injective argues that Mr. Wang is ineligible for recovery because of one or more prior material breaches of the agreement on his part. Dkt. No. 170 at 8.[4]

---

[4] At the outset, Mr. Wang argues (Dkt. No. 172 at 4–5) that Injective is barred from raising prior material breach because that theory is an affirmative defense that Injective did not raise in its answer to Mr. Want's complaint. *See* Fed. R. Civ. P. 8(c). While it is true that an affirmative defense must ordinarily be raised in a party's answer or in a motion to dismiss at the outset of the case, the failure to plead an affirmative defense does not render the defense waived unless the plaintiff can show that the failure to plead the affirmative defense prejudiced him. *See Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 506 (3d Cir. 2006); *Sharp v. Johnson*, 669 F.3d 144, 158 (3d Cir 2012); *Charpentier v. Godsil*, 937 F.2d 859, 863–64 (3d Cir. 1991); *Williams v. Lampe*,

11

Injective's first theory of prior breach by Mr. Wang is that Mr. Wang failed to bring investors to Injective.  The Consulting Agreement required Mr. Wang to "make introductions to and assist in the acquisition of customers, strategic partners and key industry contacts and facilitate and attend meetings with such potential customers, partners and key contacts."  Statement of Work at § 1(I).  Injective cites testimony from Mr. Wang that suggests Mr. Wang introduced Injective to potential investors but did not assist in acquiring investments from those potential investors.  Dkt. No. 158-4 at 91:18–92:14.

Mr. Wang identifies a variety of actions he took on behalf of Injective, including introducing Injective to potential investors, Dkt. No. 161-3 at 412:15–20, obtaining media coverage for Injective, Dkt. No. 161-20, and preparing pitch materials, Dkt. No. 161-3 at 404:8–405:3.  Whether Mr. Wang's efforts were sufficient to satisfy his obligations under the Consulting Agreement is a question of fact for the jury to decide.

Injective's next theory of breach is that Mr. Wang improperly disclosed confidential Injective information.  The Consulting Agreement requires Mr. Wang to "hold all Confidential Information in strict confidence, not to use it in any way, commercial or otherwise, except in the performing Services, and not to disclose it to others."  Consulting Agreement at § 5.  Injective cites record evidence suggesting that Mr. Wang disclosed information regarding Injective—specifically, valuation and price information—to third parties.  Dkt. No. 158-6; Dkt. No. 158-7.  Mr. Wang cites record evidence suggesting that the individuals who received that information were potential

_____

399 F.3d 867, 871 (7th Cir. 2005).  There is no suggestion in this case that Mr. Wang has been prejudiced by the delay in Injective's expressly raising the issue of prior material breach, which, as Mr. Wang is well aware, has been a central dispute in this case since the outset.  *See* Dkt. No. 1 at ¶¶ 4, 19–25, 29, 35, 40–46.  Injective will therefore not be prohibited from raising the defense of prior material breach by Mr. Wang.

investors, so his disclosures were permissible under the Consulting Agreement.  Dkt. No. 172-3 at 3.  Whether Mr. Wang disclosed the information in performing his consulting services pursuant to the Consulting Agreement is a question of fact for the jury to decide.

Finally, Injective makes the same argument regarding breach of the lockup provision for the Consulting Agreement as it did for the SAFTs.  As discussed above, that theory entails multiple factual disputes that must be resolved by a jury.

Because there are disputes of fact as to whether Mr. Wang breached the Consulting Agreement, thereby discharging Injective's obligation to deliver tokens to him, I will deny each party's motion for summary judgment asserting that the other party breached the Consulting Agreement.

### 3.  Damages

Both Mr. Wang and Injective have moved for summary judgment regarding damages.  In his motion, Mr. Wang identifies a methodology that he argues should be applied to calculate the damages to which he is entitled due to Injective's withholding of the tokens that had been promised to him.  Dkt. No. 161 at 14–19.  For the reasons explained above, however, Mr. Wang has not established that he is entitled to summary judgment that Injective is liable for breach of contract, so it would be premature to consider what, if any, damages Mr. Wang is entitled to.  Moreover, the proper methodology for calculating damages, in the event Injective is found to be in breach, will likely depend on the evidence at trial.  Mr. Wang's motion for summary judgment will therefore be denied.

For its part, Injective argues that Mr. Wang cannot prove his entitlement to damages, because I previously struck portions of the report prepared by Mr. Wang's damages expert.  Dkt. No. 158 at 7–9.  Injective explains that the task of valuing cryptocurrency tokens in general, and

under the circumstances of this case in particular, is sufficiently complex that expert testimony is needed to support any award of damages. *Id*. As legal authority for that argument, Injective cites cases in which the court considered expert testimony when valuing digital assets. *Id*. at 8 n.2. Based on those cases, Injective argues that it will be impossible for Mr. Wang to establish a reliable measure of damages without the aid of an expert who can testify as to the various factors bearing on the valuation of such assets.

Mr. Wang responds that his damages can easily be measured using a straightforward calculation that has been used by Delaware and California courts. Dkt. No. 172 at 1. He argues that this case involves a simple breach of contract claim, for which he seeks expectation damages, the normal remedy in such cases. Moreover, he argues that the amount of his damages need not be proved with precision. Mr. Wang points to California law, which governs the Consulting Agreement, and Delaware law, which governs the SAFTs, both of which provide that "when a contract is breached, expectation damages can be established as long as the plaintiff can prove the *fact* of damages with reasonable certainty. The *amount* of damages can be an estimate." *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1111 (Del. 2015) (emphasis in original); *accord Meister v. Mensinger*, 230 Cal. App. 4th 381, 396–97, 178 Cal. Rptr. 3d 604, 616 (2014) ("Where the *fact* of damages is certain, the amount of damages need not be calculated with absolute certainty." (emphasis in original)). "The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation." *Id.*

Here, Mr. Wang has set forth a basis for computing damages, which involves multiplying the number of tokens that were not delivered by the price of the tokens at the time of the breach and summing the results for each breach. *E.g.*, Dkt. No. 172 at 2. Mr. Wang argues that the jury would

need only to perform simple addition and multiplication of numbers in the record to arrive at an appropriate measure of damages.  *Id.*

Injective has not suggested that expert testimony is necessary to establish damages in all breach-of-contract cases; rather, it contends that the special circumstances of this case, including the difficulty of measuring the value of digital assets, require expert testimony to support any damages award.  Although such testimony may be preferable, it is not required if Mr. Wang can introduce adequate evidence to provide the jury with "sufficient tools" for estimating his damages. *See DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1223 (9th Cir. 2010) (upholding damages verdict despite expert testimony having been excluded).

I will not attempt to predict at this juncture whether the evidence will support a jury verdict awarding substantial damages to Mr. Wang in the absence of affirmative testimony on damages from an expert.  Whether that turns out to be so will depend on the nature of the evidence and the amount of damages the jury awards if it returns a verdict for Mr. Wang.  And even if it turns out that Mr. Wang's evidence is not sufficient to establish the fact of damages with reasonable certainty or support a reasonable basis for computing an amount of damages, the jury will be permitted to award nominal damages.  That is true under California law.  *See Elation Sys., Inc. v. Fenn Bridge LLC*, 71 Cal. App. 5th 958, 965–66, 286 Cal. Rptr. 3d 762, 769 (2021) ("[A] plaintiff is entitled to recover nominal damages for the breach of a contract, despite inability to show that actual damage was inflicted upon him.  Nominal damages may be properly awarded for the violation of a contractual right because failure to perform a contractual duty is, in itself, a legal wrong that is fully distinct from the actual damages." (citation omitted)).  And it is also true under Delaware law.  *See Ivize of Milwaukee, LLC v. Complex Litig. Support, LLC*, No. CIV.A. 3158, 2009 WL 1111179, at *12 (Del. Ch. Apr. 27, 2009); *Cygnus Opportunity Fund, LLC v.*

*Washington Prime Grp., LLC*, 302 A.3d 430, 454 (Del. Ch. 2023) ("The principal issue at the pleading stage is the existence of a contractual violation. . . . [U]nexcused failure to perform a contract is a legal wrong. An action will therefore lie for the breach although it causes no injury.").[5]

Injective can argue to the jury the points it has made in its summary judgment motion for why Mr. Wang's damages ask is unsupported by sufficient evidence, but Injective's motion for summary judgment will be denied.[6]

Injective also argues for the first time in its reply brief that Mr. Wang's noticed damages theory fails as a matter of law. Dkt. No. 175 at 1–2. Injective argues that Mr. Wang alleged that his damages from the breach of the Consulting Agreement amounted to $56,320,000 throughout discovery, but that he now asserts that he is entitled to a higher damages amount based on a new valuation date, token price, and damages methodology. *Id.* at 1. Therefore, Injective concludes

---

[5] The California court in *Elation Systems* pointed out that although federal courts in the Ninth Circuit had previously ruled that breach of contract claims are not actionable under California law absent a showing of appreciable and actual damage, state courts in California have held that breach of contract is actionable under California law even in the absence of a showing of monetary damages. *Elation*, 71 Cal. App. 5th at 966, 286 Cal. Rptr. 3d at 769 (citing Cal. Civ. Code § 3360 and *Sweet v. Johnson*, 169 Cal. App. 2d 630, 632, 337 P.3d 499, 501 (1959)); *see also Frasco v. Flo Health, Inc.*, No. 21-cv-757, 2025 WL 1433825, at *18 (N.D. Cal. May 19, 2025).

[6] The parties present opposing views as to the appropriate method for measuring the value of the subject assets in a case such as this one. Mr. Wang argues for the "New York rule," which looks to the "highest intermediate trading price" of the asset during a reasonable period following the breach. Injective argues that California has not adopted that rule. Dkt. No. 158 at 9. Mr. Wang contends, however, that California has recently adopted the New York rule and that it therefore governs this case. *See* Dkt. No. 172 at 1 (citing *Shah v. Skillz Inc.*, 101 Cal. App. 5th 285, 309, 320 Cal. Rptr. 3d 175, 195–96 (2024)). Mr. Wang overstates the holding of *Shah*. There, the California appellate court explicitly declined to determine whether the "New York rule" applies under California law given that neither party challenged the formula used by the trial court to calculate damages. 101 Cal. App. 5th at 311 n.18. Which method is appropriate will likely depend on the evidence presented at trial, and therefore it is not necessary to resolve that dispute at this time. *See, e.g., id.* at 305–07 (explaining how the evidence presented at trial supported the trial court's selection of the method for calculating damages).

that Mr. Wang has admitted that he cannot establish the damages theory he put forth during discovery.  *Id.* at 2.

Although Injective's argument is new in its reply brief, the parties previously addressed a similar issue in their briefing regarding Injective's motion to strike the report of Mr. Wang's damages expert.  Dkt. No. 132 at 7–8; Dkt. No. 142 at 18–20; Dkt. No. 143 at 4–6.  I will therefore address the issue.

In the briefing on Injective's motion to strike Mr. Wang's expert report on damages, Mr. Wang argued that he alleged he was entitled to $56,320,000 based on his claim for conversion brought against Mr. Chen.  Dkt. No. 142 at 18.  He represented that he separately alleged that he was entitled to damages based on Injective's breach of the Consulting Agreement, the amount of which would continue to accrue as Injective continued to withhold tokens.  *Id.*  Mr. Wang also argued that he identified the methodology for calculating damages on which he intended to rely in his initial pleading.  *Id.* at 5 (citing Dkt. No. 20 at ¶ 115).  Injective responded that Mr. Wang's allegations in his pleading did not satisfy his obligations under Rule 26.  Dkt. No. 143 at 5–6.

Mr. Wang is correct that he sought $56,320,000 as the remedy for his alleged conversion claim against Mr. Chen.  Dkt. No. 20 at ¶ 193.  In addition, he alleged that he had and would continue to suffer compensable injury in an amount to be determined from the breach of the Consulting Agreement by Injective.  *Id.* at ¶¶ 159–163.  Moreover, his pleading described his method for calculating the value of withheld tokens, which appears to be consistent with the methodology he now advances.  *Id.* at ¶¶ 106–115.  Accordingly, Mr. Wang's representation that the amount of his claim for damages has continued to increase because damages have continued to accrue during the pretrial period appears to be consistent with his pleadings.  *See* Dkt. No. 142 at 18.  Therefore, I disagree with Injective that Mr. Wang has conceded that he cannot prove his

damages as alleged.[7]  Injective's request for summary judgment based on that argument will be denied.

### 4. Unclean Hands

Injective moves for summary judgment that Mr. Wang's claims are barred by the doctrine of unclean hands.  Injective argues that Mr. Wang's actions amounted to misconduct that should bar him from recovery.  Dkt. No. 158 at 15.  The challenged actions, however, are the same actions that Injective identifies as the support for its claim that Mr. Wang breached the agreements—i.e., disclosing confidential information, submitting false information on forms submitted to Injective, and improperly reselling his interest in the tokens.  *Id.*  For the reasons set forth above, there are disputes of fact as to whether Mr. Wang breached the agreements.  Injective therefore has not established that it is entitled to summary judgment on its claim that Mr. Wang acted with unclean hands.

### 5. Tort Claims

Injective argues that Mr. Wang has not pointed to evidence sufficient to establish his conversion claim, his civil theft claim, or his unjust enrichment claim.  To support his conversion claim, Mr. Wang must establish (1) that he "has a property interest in the allegedly converted property"; (2) that he "had a right to possession of the property"; and (3) that Injective "wrongfully possessed or disposed of such property as if it were [its] own."  *ESG Cap. Partners II, LP v. Passport Special Opportunities Master Fund, LP*, 2015 WL 9060982, at *15 (Del. Ch. Dec. 16, 2015).  Injective argues that Mr. Wang had no property interest in the tokens and thus had no right

---

[7] To the extent Injective's argument is that the damages theory offered by Mr. Wang's expert is inconsistent with his Rule 26 disclosures, that argument has been rendered moot given that I granted Injective's motion to exclude Mr. Wang's damages expert's affirmative damages theory.

to possess them because his right was only to purchase the tokens.  Dkt. No. 158 at 17–18.  Injective further contends that Mr. Wang's claim fails because his entitlement to the tokens is contractual only, and California law does not recognize a contractual right to property as a proper ground on which to base a claim of conversion.  *See Beluca Ventures LLC v. Aktiebolag*, 622 F. Supp. 3d 806, 814 (N.D. Cal. 2022) ("[A] breach of duties that merely restates contractual obligations does not normally give rise to conversion."); *Spates v. Dameron Hosp. Ass'n*, 114 Cal. App. 4th 208, 222, 7 Cal. Rptr. 3d 597, 609 (2003) ("Not every failure to deliver property to the rightful owner constitutes a conversion.").

Mr. Wang responds, first, that Injective's interpretation of the purchase term in the Consulting Agreement is contrary to the extrinsic evidence and that the correct interpretation of the term is that Mr. Wang was entitled to the tokens for free.  Dkt. No. 172 at 19–20.  For the reasons explained above, the Consulting Agreement granted Mr. Wang a right to purchase tokens, not a right to receive tokens for free.

Mr. Wang's second response is that his conversion claim is not duplicative of his breach of contract claims because Mr. Chen is not a party to either the Consulting Agreement or the SAFTs. *Id.* The flaw in Mr. Wang's conversion claim, however, is not simply that it is duplicative of his breach of contract claims; the problem is that an assertion of entitlement to property based on contract rights does not constitute a taking of property for purposes of conversion.  Accordingly, because Mr. Wang has not put forth evidence to show that he had a property interest in the tokens that Injective took from him, Injective is entitled to summary judgment of no conversion.

Regarding civil theft, Injective argues that neither Injective nor Mr. Chen had the requisite criminal intent to be found liable for that tort.  Dkt. No. 158 at 18–19.  Mr. Wang does not respond.

19

Under California law,[8] "theft" is defined to include "defraud[ing] any other person of money, labor or real or personal property."  Cal. Penal Code § 484(a).  The elements of civil theft are: (1) "property was stolen or obtained in a manner constituting theft"; (2) "the defendant knew the property was so stolen or obtained"; and (3) "the defendant received or had possession of the stolen property."  *Siry Investment, L.P. v. Farkhondehpour*, 13 Cal. 5th 333, 354, 513 P.3d 166, 179 (2022).  To ensure that "[o]rdinary commercial defaults" are not "transformed into a theft," California law requires that a plaintiff alleging civil theft must "establish criminal intent on the part of the defendant beyond 'mere proof of nonperformance or actual falsity.'"  *Id.* at 184.  Given that Mr. Wang has not put forth any evidence regarding criminal intent, as opposed to mere breach of contract, summary judgment of no civil theft will be granted.

Regarding unjust enrichment, Injective argues that Mr. Wang provided no beneficial services to Injective.  Mr. Wang responds by identifying evidence suggesting that the services he provided to Injective were valuable.  *E.g.*, Dkt. No. 172-1 at ¶¶ 39–40 (sworn declaration from Mr. Wang that Mr. Chen "repeatedly expressed his appreciation for [Mr. Wang's] work").  Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999) (citation omitted).  Whether Injective was enriched by Mr. Wang's work is a question of fact for the jury.  Injective's motion for summary judgment of no unjust enrichment will be denied.

---

[8] Mr. Wang relies on the California Penal Code as the basis for the definition of theft.  Dkt. No. 20 at ¶ 206.

### B. Exclusion of Expert Testimony

Federal Rule of Evidence 702 allows a witness "qualified as an expert by knowledge, skill, experience, training, or education" to testify to "assist the trier of fact to understand the evidence or to determine a fact in issue." *See generally Daubert*, 509 U.S. at 579. The Third Circuit interprets the qualification requirement "liberally" and has held that "a broad range of knowledge, skills, and training qualify an expert as such." *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003); *see also Sonos, Inc. v. D & M Holdings Inc.*, 297 F. Supp. 3d 501, 508 (D. Del. 2017).

Both parties submitted multiple expert reports. Mr. Wang submitted an initial report and a rebuttal report from Mary Lewis. Her reports address the standard industry practices related to the promise of future tokens. Mr. Wang also submitted a rebuttal report from Timothy McKenna. His report addresses damages. Injective submitted an initial report from Franck Risler. His report addresses damages. Injective also submitted an initial report from Annemarie Tierney. Her report addresses compensation practices in the cryptocurrency industry.

### 1. Dr. Risler

Dr. Risler offers a damages opinion in which he bases his calculations as to the value of the tokens that Mr. Wang contends he is owed as of the date the tokens were listed for public sale on an exchange. Dkt. No. 163-1 at 7–8. Mr. Wang argues that Dr. Risler is using the wrong date of breach. Dkt. No. 163 at 3–8. Mr. Wang states that the breach occurred on the date on which the tokens were supposed to be delivered to him. *Id.* at 4. Therefore, Mr. Wang explains, his damages must be measured by taking the highest value of the tokens as of a reasonable time period following the date on which the tokens were supposed to be released to him. *Id.*

a.  The SAFTs provide Mr. Wang with the right to receive tokens "automatically and without any future payment" at the time of a Qualifying Token Sale.  1st SAFT at § 1(a); 2nd SAFT at § 1(a).  The term "Qualifying Token Sale" is defined as "the first of a Primary Listing or a Token Sale to Outside Investor."  1st SAFT at § 2; 2nd SAFT at § 2.  The term "Primary Listing" is defined as "the first offer of the Tokens to the public by one or more digital asset exchanges," and the term "Token Sale to Outside Investor" is defined as "the next bona fide sale of Tokens by the Token Issuer in exchange for a delivery of purchase price, a contribution, or any other items of value, including other cryptocurrencies, for capital raising purposes, negotiated on an arms-length basis, primarily to third parties who are not directors, officers, employees, advisors or existing equity investors in the Company."  1st SAFT at § 2; 2nd SAFT at § 2.  The SAFTs also provide a method for calculating the number of tokens Mr. Wang would receive: dividing the amount he paid by the price of the tokens on listing day discounted by a set amount, or dividing the amount he paid by the lowest sale price of the tokens to an outside investor discounted by a set amount.  1st SAFT at §§ 1, 2; 2nd SAFT at §§ 1, 2.  Finally, the SAFTs provide that the tokens would be delivered by the third-party issuer at "any time after such Qualifying Token Sale, but no later than as soon as practicable following each respective Release Date."  1st SAFT at § 1(b)(i); 2nd SAFT at § 1(b)(i).  The release schedule provides that approximately one third of the tokens would be released by six months after the Qualifying Token Sale, one third would be released by nine months after the Qualifying Token Sale, and the final third would be released by one year after the Qualifying Token Sale.  1st SAFT at § 5(b); 2nd SAFT at § 5(b).

To summarize, under the SAFTs Injective agreed to provide Mr. Wang with the right to tokens as of the listing date, with the number of tokens to be determined based on the listing price. Injective also agreed that a third party would deliver those tokens to Mr. Wang within a certain

time period.  Based on the plain language of the SAFTs, the listing date is the day on which Mr. Wang was supposed to receive his rights to the tokens.  Accordingly, to the extent Injective breached the agreement by withholding tokens from Mr. Wang, that breach occurred on the listing date when Mr. Wang did not receive his full rights to the tokens.  Dr. Risler's use of the listing date as the date of breach is thus consistent with the SAFTs and does not render his opinions regarding those agreements unreliable.

      **b.**  As explained above, the Consulting Agreement provided Mr. Wang with the right to purchase tokens.  Injective would have breached the agreement if Mr. Wang had sought to purchase tokens and Injective had denied him the opportunity to make such a purchase.  In that circumstance, the breach would have occurred on the date of Injective's denial.  Injective justifies Dr. Risler's use of the listing date by referring to the Consulting Agreement's lockup provision, which prohibited Mr. Wang from selling his interests in the tokens for a certain time period following the listing.  Dkt. No. 169 at 6–7.  But nothing in the lockup provision required Mr. Wang to make a purchase as of the listing date.  Statement of Work at § 2.  To the extent Mr. Wang purchased tokens within the first six months after the listing, he would be subject to the lockup provision; to the extent Mr. Wang purchased tokens after the first six months following the listing, he would not be subject to that provision.  In other words, because the Consulting Agreement does not set an expiration date on Mr. Wang's right to make a purchase, the application of the lockup provision would depend on when Mr. Wang exercised his purchase rights.

      Mr. Wang does not dispute that the listing date of the tokens was October 20, 2020.  *See* Dkt. No. 163 at 4–5.  But he does not concede that he sought to purchase the tokens on that date.  Instead, he argues that he "began asking" about the tokens in April 2021.  Dkt. No. 172 at 14.  Therefore, in view of the contract interpretation set forth above, there is no dispute that there was

no breach as of the listing date. As a result, Dr. Risler's damages calculations that use the listing date are based on the wrong date of breach; his testimony on that issue therefore does not satisfy the requirements of Federal Rule of Evidence 702(b) that expert testimony must be "based on sufficient facts or data." Those opinions will be excluded.

As an alternative, Dr. Risler offers a damages theory using July 1, 2021, as the date of breach. Dkt. No. 163-1 at 38. Injective notes that Mr. Wang has pleaded that Injective's breach occurred by July 1, 2021. Dkt. No. 169 at 7 (citing Dkt. No. 20 at ¶¶ 145, 162, 188, 193). Injective adds that Mr. Wang further committed to July 1, 2021, as the date of Injective's breach in his Rule 26(a) disclosures. *Id.* at 8 (citing Dkt. No. 143-1, Ex. A). Mr. Wang challenges the methodology that Dr. Risler applies for his July 1, 2021, theory, but Mr. Wang does not challenge Dr. Risler's use of July 1, 2021, as the date of breach. Dkt. No. 173 at 6–7. Accordingly, and for the additional reasons set forth below, Dr. Risler will be permitted to present that damages theory.

Mr. Wang next challenges the methodology Dr. Risler uses to value the tokens. Mr. Wang argues that the appropriate way to calculate the value of the tokens is to use the highest market price for the tokens during a reasonable time period following breach. Dkt. No. 163 at 8. In contrast, Dr. Risler uses the volume-weighted average price for the tokens following the breach, and he applies a discount based on the estimated downward price pressure on the token market from the hypothetical sale of Mr. Wang's tokens and from the restriction on Mr. Wang's ability to sell his tokens. *Id.* at 9–11. Mr. Wang takes issue with Dr. Risler's analysis, and argues that the "highest market price during a reasonable period following the breach" is the proper legal standard for measuring damages, and he cites cases in which courts have purportedly applied that approach. Dkt. No. 173 at 1–3.

24

Although the cited cases calculate damages using Mr. Wang's approach, they do not suggest that there are no other appropriate approaches to calculating damages in a case such as this one. *See, e.g.*, *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1024 (Del. 2001) (finding the methodology "satisfactory" based on its review of the circumstances of the case). Therefore, although Mr. Wang may believe that using the highest market price within a reasonable period after the breach more accurately represents the value of the tokens that the parties envisioned when they entered into the agreements than using a discounted volume-weighted average price, Mr. Wang has not established that Dr. Risler's methodology is unreliable under the *Daubert* standard. Mr. Wang can challenge Dr. Risler's use of a discounted volume-weighted average price on cross-examination or with contrary evidence of his own, but he has not established the right to have Dr. Risler's methodology excluded from the jury's consideration. *See Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002) ("A party confronted with an adverse expert witness who has sufficient, though perhaps not overwhelming, facts and assumptions as the basis for his opinion can highlight those weaknesses through effective cross-examination.").

In his report, Dr. Risler took the position that $0.40 per token would have been the appropriate purchase price for the tokens under the Consulting Agreement. In support of that valuation, Injective argues that $0.40 is a reasonable price because it was the price of the tokens as of the listing date, which was also the lowest trading price. Dkt. No. 169 at 14. Although Mr. Wang challenges Dr. Risler's valuation, he has not responded to Dr. Risler's explanation for his valuation, so there is no basis for ruling that Dr. Risler should be barred from testifying as to his valuation.

In sum, Mr. Wang's motion is granted with respect to Dr. Risler's opinions regarding the Consulting Agreement that are based on the listing date as the date of breach. His motion is otherwise denied.

### 2. Ms. Tierney

Injective offers expert testimony from Ms. Tierney, who proposes that although the Consulting Agreement states that Mr. Wang would be entitled to 8,000.000 tokens for his consulting work, he is actually eligible to receive only 800,000 tokens. Mr. Wang argues that Ms. Tierney's opinions should be excluded because they contradict the plain language of the Consulting Agreement. Dkt. No. 163 at 15–16.

In her report, Ms. Tierney points out that after the Consulting Agreement was signed, Injective reduced the number of tokens that were available to the public, so Mr. Wang's share should be reduced proportionately. Dkt. No. 163-1 at 634–37. She supports her conclusion by reference to communications between Mr. Wang and Mr. Chen, which she characterizes as evincing the parties' intent with regard to the agreement. *Id.* at 632. Injective argues that to the extent it is appropriate to consider extrinsic evidence in interpreting the agreement regarding the purchase term, it is appropriate for Ms. Tierney to testify about the parties' intent regarding the number of tokens to which Mr. Wang would be entitled. Dkt. No. 169 at 16–17.

The Consulting Agreement plainly identifies the number of tokens that Mr. Wang would have the right to purchase. Statement of Work at § 2. For the same reasons set forth above with regard to Mr. Wang's interpretation of the purchase provision, the plain language of the agreement will control. Therefore, Ms. Tierney's testimony that Mr. Wang is not entitled to purchase 8,000,000 tokens is contrary to the correct interpretation of the agreement and will be excluded. *Allscripts Healthcare, LLC v. Andor Health, LLC*, No. 21-704, 2022 WL 3021560, at *26 (D. Del.

July 29, 2022) (holding that experts "may not testify about their interpretation of a contract and the rights and obligations of the parties based on their interpretation" of the contract language).

### 3. Mr. McKenna

Mr. McKenna's report was submitted on behalf of Mr. Wang to rebut Dr. Risler's initial report. Mr. McKenna's report contains some opinions that are responsive to Dr. Risler's opinions and some opinions that offer a new valuation theory for the tokens for purposes of assessing damages. Injective moved to strike Mr. McKenna's report on the ground that the report was not a proper rebuttal report. Dkt. No. 131. I granted the motion in part, striking certain paragraphs of Mr. McKenna's report, which offered an affirmative damages theory. Dkt. No. 149. Now Injective challenges the remaining paragraphs of Mr. McKenna's report. Injective argues that Mr. McKenna offers opinions regarding the appropriate legal standard for measuring damages, even though he does not have any expertise in that subject area, and even though interpretations of the law are not an appropriate subject for expert testimony. Dkt. No. 156 at 5, 8.

To the extent Mr. McKenna seeks to tell the jury what legal standard for measuring damages it should apply, that testimony will be precluded, as an expert may not render a legal opinion. *See Berckeley Inv. Grp., Ltd v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006). But Mr. McKenna will be permitted to assume a legal standard and then apply his analysis based on that assumption; it is a common and acceptable method for experts to set forth their analysis within a legal framework that they are asked to assume is applicable, so long as the court has not ruled otherwise. *See Olin Corp. v. Lamorak Ins. Co.*, No. 84-cv-1968, 2018 WL 1901634, at *21 (S.D.N.Y. Apr. 18, 2018) ("Where the legal or factual sustainability of a party's theory has not yet been decided, the possibility that such theory 'may be legally or factually deficient" is 'not justification[] for concluding that, in the context of [that party's] theory, [the expert's] testimony

27

is unreliable or unhelpful.'" (citing *In re Pfizer Sec. Litig.*, 819 F.3d 642, 661 (2d Cir. 2016)));

*Crescent City Remodeling, LLC v. CMR Constr. & Roofing, LLC*, No. 22-859, 2024 WL 3970527,

at *2 (E.D. La. Aug. 28, 2024) ("The underlying issue—the interpretation of the contract—is an

issue upon which the Court has not yet ruled.  It would be premature to exclude only one expert's

testimony related to damages merely because it assumes a possible interpretation, absent a ruling

on the proper interpretation of the contract language.").

Other portions of Mr. McKenna's report address the dispute over the correct date of breach.

Dkt. No. 132-1, Ex. A at ¶¶ 17–18, 44–51, 57, 71.  Based on the above analysis addressing the

correct date of breach, those opinions are no longer relevant and will not assist the jury.  They will

be excluded.  Other opinions of Mr. McKenna address whether Mr. Wang had the right to receive

tokens for free. *Id.* at ¶¶ 56, 58.  Based on the above analysis interpreting the purchase term, those

opinions are no longer relevant and will not assist the jury.  They too will be excluded.  As for Mr.

McKenna's testimony about Ms. Lewis's observations regarding the typical compensation paid to

consultants, his report merely parrots that of Ms. Lewis and offers no additional information based

on his own expertise.  He will therefore not be allowed to testify on that issue.

Mr. McKenna's remaining opinions critique Dr. Risler's methodology. *Id.* at ¶¶ 19–24.

Although Mr. McKenna will not be permitted to present his own affirmative theory of damages,

he will be allowed to critique Dr. Risler's theory, such as by testifying that Dr. Risler's discounting

of the token price would understate Mr. Wang's damages. *E.g.*, *id.* at ¶ 21.  In other words, Mr.

McKenna will not be allowed to testify as to what he thinks the correct calculation of damages

should be, but he will be allowed to testify as to why he thinks Dr. Risler's calculation is incorrect.

Injective also challenges Mr. McKenna's opinions based on his admission that he relied on

assumptions supplied to him by Mr. Wang's counsel regarding the correct framework for

calculating damages.  Dkt. No. 156 at 5.  Injective similarly argues that Mr. McKenna focused on the wrong jurisdiction, reviewed an insufficient number of cases, and failed to consider specific facts of the case.  *Id.* at 8–10.  Finally, Injective argues that the dates of breach used in Mr. McKenna's calculations are inconsistent with Mr. Wang's Rule 26 disclosures.  Dkt. No. 177 at 6.  Because Mr. McKenna will be precluded from offering an affirmative damages theory, those critiques are moot.

### 4.  Ms. Lewis

In seeking to exclude Ms. Lewis's testimony, Injective first argues that Ms. Lewis lacks expertise in the relevant subject area, which Injective identifies as "cryptocurrency incentive pay for foreign consultants."  Dkt. No. 156 at 6.  For example, Injective notes that Ms. Lewis has worked only part time, has worked on only a limited number of cases, and has had limited experience with employees based in China during the time period in which she developed compensation plans for clients.  Dkt. No. 156 at 6–7.  As noted above, however, the Third Circuit interprets the qualification requirement for experts liberally and has recognized that qualifying expertise can be based on a broad range of skills and training.  *Calhoun*, 350 F.3d at 321; *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994).  Ms. Lewis has experience implementing compensation plans for companies and has worked on plans involving tokens.  Dkt. No. 156-1 at 11–12 (curriculum vitae).  Accordingly, she is at least minimally qualified to provide expert testimony regarding cryptocurrency incentive pay for foreign consultants.  *See Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996) ("[W]itnesses may be competent to testify as experts even though they may not, in the court's eyes, be the 'best' qualified.  Who is 'best' qualified is a matter of weight upon which reasonable jurors may disagree."); *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008).  Generally speaking, "arguments about an expert's

qualifications relate more to the weight to be given to the expert's testimony than to its admissibility." *Holbrook*, 80 F.3d at 782. Injective's objections to Ms. Lewis's qualifications to speak authoritatively on the subjects of her testimony can be addressed on cross-examination at trial.

Injective next argues that Ms. Lewis's testimony is not relevant because it addresses industry practices instead of the facts of this case and is based on the practices of emerging companies generally rather than the practices of cryptocurrency companies specifically. Dkt. No. 156 at 11–12. Similarly, Injective challenges whether Ms. Lewis spent enough time on her report and reviewed the facts of this case as opposed to deferring to representations from Mr. Wang's counsel. *Id.* at 15–16. Injective also points out what it alleges to be inconsistencies in her opinions. *Id.* at 16–17. Injective can address those issues on cross-examination; they do not justify excluding her testimony altogether. *See Stecyk*, 295 F.3d at 414.

Finally, Injective argues that Ms. Lewis's rebuttal report does not constitute proper rebuttal. Dkt. No. 156 at 17–18. Ms. Lewis's rebuttal report is mainly directed at rebutting Ms. Tierney's testimony. Dkt. No. 156-2 at 4–7. In objecting to Ms. Lewis's rebuttal report, however, Injective focuses on the portion of Ms. Lewis's rebuttal report that is directed at a valuation report produced by Injective, *id.* at 4, arguing that her opinions in that section of her report do not respond to Ms. Tierney's testimony. Dkt. No. 177 at 9–10. Injective is correct that in section IV of her rebuttal report, Ms. Lewis addresses Injective's valuation report without any discussion of or citation to Ms. Tierney's testimony. *See* Dkt. No. 156-2 at 7. Accordingly, section IV of Ms. Lewis's report is not proper rebuttal, so her testimony based on that portion of her report will be excluded. *See Withrow v. Spears*, 967 F. Supp. 2d 982, 1001 (D. Del. 2013) ("The function of rebuttal evidence is to explain, repel, counteract or disprove evidence of the adverse party.").

*    *    *

In an abundance of caution, this order has been filed under seal because the parties' briefs and exhibits regarding the present motions were filed under seal.  Within three business days of the issuance of this order, the parties are directed to advise the court by letter whether they wish any portions of this order to remain under seal.  Any request that portions of the order should remain under seal must be supported by a particularized showing of need to limit public access to those portions of the order.

IT IS SO ORDERED.

SIGNED this 26th day of June, 2025.


_____
WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE