1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| XIN WANG, | ) |
| | ) |
| Plaintiff, | ) |
| | ) C.A. No. 22-943(WCB) |
| v. | ) |
| | ) |
| INJECTIVE LABS, INC., | ) |
| et al., | ) |
| | ) |
| Defendants. | ) |

Monday, February 2, 2026
10:00 a.m.
Pretrial Conference (via Zoom)


844 King Street
Wilmington, Delaware


BEFORE:   THE HONORABLE WILLIAM C. BRYSON
          United States District Court Judge




APPEARANCES:


          BILLION LAW
          BY:  MARK M. BILLION, ESQ.

          -and-

          BULL BLOCKCHAIN LAW LLP
          BY:  JAMES WINES, ESQ.
          BY:  TYLER HARTTRAFT, ESQ.


                    Counsel for the Plaintiff

APPEARANCES CONTINUED:


                    BUCHANAN INGERSOLL & ROONEY PC
                    BY:  KODY MACGYVER SPARKS, ESQ.

                    -and-

                    BROWN RUDNICK LLP
                    BY:  STEPHEN PALLEY, ESQ.
                    BY:  JOHANNA P. FAY, ESQ.
                    BY:  HAYDEN A. MILLER, ESQ.

                             Counsel for the Defendant




                    – – – – – – – – – – – –




THE COURT:  Good morning.  This is Judge Bryson. Do we have a court reporter?  Dale, are you there?

THE REPORTER:  Yes, Your Honor, I am on.

THE COURT:  Let's wait another minute or so.  We may have a few more people coming on.  Before while we're doing that, we'll go through the preliminaries.  The first thing I'll do is set this to record as a backup for our court reporter.

Let me call the case.  This is the pretrial conference in Xin Wang against Injective Labs, Incorporated and Zhonghan "Eric" Chen.

And Dale, at the end of this I will stay on the line with you for a few minutes.  There are some spelling

issues that you may want some help with and I'll be happy to do that either with respect to names or cases and that sort of thing.  So after we're adjourned we'll sit down and see what you need.

The case number is 22-943, District of Delaware. So I guess we got everybody we're going to have.

Let's start.  Let me tell you what I plan to do here procedurally.  Unlike last week, I don't have an unlimited amount of time, so I want to be very crisp about getting through the material that we need to cover.  What I will do is to first go through some of my usual practices so that you know what to expect at trial, at least from me. And then I'll go over the pretrial order.  There is not a whole lot that I need to comment on, but there are a few things that are important that I want to emphasize.

And then I will give you an opportunity -- well, actually after my initial comments I'll give you an opportunity for questions.  That's probably the most appropriate time.  After we go through the pretrial order, I have a few specific issues that I want to discuss, issues that were touched on last Wednesday and have been the subject of some subsequent briefing, but a few of the MILs that I need some assistance from you on.

So let's start just with my list of usual practices, idiosyncrasies and the like.

If there is a question that comes up where I'm not clear about something, you should feel free to dive in, but I will give you some time at the end to ask questions.

First of all, let me say that I try, not always successfully, but I try to follow Delaware practice, both the Delaware rules and the practices usually employed by the Delaware courts wherever I can, unless I consciously depart. And there are a few things that I do, maybe a little differently from the general practice in Delaware, but I'll cull those out.

If there is anything I do at any point which seems to you to be either contrary to Delaware practice or just something that seems like a bad idea, I am open to hearing from you.

Now, I have done a number of these cases in Delaware, so I have a pretty good idea, I think, at this point of what the Delaware practice is, but I am always open to being educated if I get these wrong.

So, my general approach is to try to let the parties try their cases and not interfere unduly in their effort to do so. And I think all judges say that and not all judges do it, but I will try to do it.

I will not often, but I might at some point, but I will not often interpose objections of my own unless things start to get out of hand in which I will.

In the courtroom, I look for decorum, obviously. And I am pretty much insistent on everybody behaving up to standards. In particular, let me say that there are a couple of things. First, you can bring water into the courtroom, but not any other beverages, and certainly not food. I actually had a lawyer once who came in after lunch and brought the rest of her sandwich in. That was -- we put an end to that pretty quickly, but let's not do anything that even approaches that level of casualness with the jury sitting there, especially.

Now, counsel and the witnesses are free to come and go as you like. You don't have to ask for leave of Court to leave the courtroom. That's not something I have ever felt is a practice worth following.

Now, when you object, if you object to anything, please stand. I will generally see you right away, but sometimes not because I will be looking at the witness, and the witness is ninety degrees away from counsel table, particularly defense counsel because they're even a little farther away by angle, so just stand and I will recognize you. And don't launch into a speech at that point, simply say objection leading, or objection hearsay, or something like that. And I will, if I understand the point, I will rule on it. If I need further elaboration, I will ask you to elaborate. I might ask the other side to state their

response.  But I am not going to have a bench conference every time somebody has an objection.

I don't like bench conferences.  I am going to employ them.  I'm not unwilling to employ them if it's absolutely necessary, but don't count on a bench conference every time you have an objection.  I want the objections to be quick.  I want them to be expressed succinctly and clearly so that I can rule.  And I am going to rule on most of them, I can assure you, without having to trot up to the bench and conduct a bench conference.  This is something I feel pretty strongly about and I have talked to a lot of juries and they all hate bench conferences, so that is something that is both a time waster and it's something that's offensive to the jury, frankly.

If we have a bench conference, this is not going to be a scrum in which all the lawyers from both sides come up to the bench, but one lawyer who is conducting the examination and the one lawyer who has raised the objection and will be handling the cross-examination, let's say handling whatever is happening with that one witness will come up to the bench and only those two, plus me and the court reporter.  So the most objectionable form of bench conferences is where everybody on each side trots up there and everybody seems to feel that they have an obligation to say something at the bench conference.

Conferences, objections generally and conferences will be timed against the party that makes the objection.  So if we have some significant delays that are produced by objections, those will be charged against the objector.  I know the argument against that, but this is designed to try to keep the discussions of objections to a bare minimum.

Okay.  Punctuality -- by the way, if it wasn't clear from that, each witness, I want one lawyer questioning, I want one lawyer cross-examining.  No team tag wrestling type processes with the witnesses.  So if you have got somebody who is having trouble, don't send somebody up there to rescue them or to carry on what the second lawyer feels is a better line of inquiry.  That's disruptive, it is confusing to the jury, and I won't allow it.

Now, punctuality, I am not -- while I am in Delaware, I don't have other things on my plate, unlike the Delaware judges, so I will not be in a position that -- every time there is a break I have to go and handle some emergency or a TRO has come over the phone, whatever it is.  That is a problem that is common for district judges in places where they're sitting in their home court, but it's not mine.  Therefore, I will be back, unless I keel over, I will be back punctually from every break and from the lunch break, the morning break, the afternoon break, and I expect

you to be punctual as well.  I don't want the lawyers and the witnesses to ooze back into court a few minutes after the time allotted and the time that I have set for the break to end.  I will do my part as best I can on this, but I have learned the hard way that there is an immense amount of time that can be lost by people not taking return time seriously.

Now, in terms of time, my law clerk will keep the time.  And this is something that you can consult with my law clerk at the end of a trial day or at any point when there is a break as to how much time remains.  This is something that becomes more important obviously as the week goes on, but he will have an ongoing clock of each side.

Let me -- let's see.  Yeah.  On exhibits, what I -- because we have already ruled on many of the exhibits and in the order that I will issue in the next day or two, I will rule on all but a few, a very small handful of the remaining exhibits, I will have determined what those exhibits -- which exhibits are admissible, but my determinations will not result in their admission.  Their admission happens in court.  So what I expect you to do, it can be done at the end of each witness's testimony, is the exhibits that were offered through that witness will be culled out, simply go through them, Plaintiff's Exhibit 19, Plaintiff's Exhibit 24, Plaintiff's Exhibit 25, and so forth, and the other side will say no objection because

those will have already been pre-qualified for admission. Therefore, I am not -- this is not an invitation to rekindle any battle over exhibits that I have ruled on. This is just a procedural mechanism for making sure that the court reporter and the record reflect what exhibits are actually admitted.

Before you rest, and I'm not going to hold you to getting all the exhibits from witness A while witness A is still on the stand, and you're not going to waive an exhibit because you forgot to put it in under witness A, you can, before you rest your case, you can make sure and we'll give you an opportunity to do this, make sure you have admitted all the exhibits you want to have in the record.

Again, my law clerk will have a list of the exhibits. The courtroom deputy will also have a list of the exhibits that have been admitted. And you should have an exhibit wrangler on each side who is following what exhibits you've offered from your perspective. They can get together with my law clerk and the courtroom deputy at a break in the action before you rest and see if there is anything that's left out that should have come in. And I will not exclude anything on the ground that you didn't move its admission until the end of your case.

After that, I am not a martinet about this, but I want all the exhibits from one side to be admitted by the

end of that side's case.  If for some reason something goes wrong and we get a mix up, that's fine, but I really want you to make an effort to take care of that before you rest.

The trial day will go from 9:00 to 5:30 depending on where we are with a particular witness.  Now, I will make myself available as early as 8 o'clock in the morning if anything comes up that needs my attention.  And the first day I would like you to be available and present at 8:30 in the morning.  The jurors should be coming in at about somewhere between 9:00 and 9:30.

Now, saying that I will make myself available is let me say qualified by the following observation.  And this is where one -- one place where I am going to depart from the joint proposed pretrial order.  I want all disputes that arose the night before a trial day to be resolved that night.  So rather than having as the current proposed schedule dictates, having you all meet and confer and decide what you disagree on in the evening and then approach me in the morning with issues, instead I want to compress the schedule so that by 8 o'clock the night before the trial day in which the dispute is going to come up, I want you to e-mail me an account of what the dispute is and your argument in e-mail as to why it is that you should prevail on this.  I will do my best to get an answer to you that evening so you know where you are before we get into the

next trial day.  If worst comes to worst, I will be available, as I say, at 8 o'clock.

Here is what I don't want to have happen and I learned this the hard way.  I don't want to get to trial at 8:00 or 8:30 on a trial day and the lawyers approach me and say we have three serious disputes, we weren't able to resolve them last night and we would like Your Honor to rule on them, and then we spend an hour of trial time trying to sort out the disputes.  That is enormously disruptive.  The jurors are sitting in the jury room wondering what is going on and we lose trial time.  We don't have a whole lot of spare time worked into the schedule here, so we're going to get these disputes resolved the night before and I need your help in doing this.

I need for you to explain what it is is the nature of the dispute, not just we have a dispute as to a hearsay issue, I want to know exactly what it is.  I want to know the legal authorities that you have that will save me having to try to do legal research on my cell phone, because I am not going to have a lot of resources when I am in Delaware and it's a real problem.  But if we follow that protocol, I think we'll be fine.  But that's something I take very seriously because it really can churn up a huge amount of time, as I discovered, I think, at my first trial back in I think -- I think I started doing these in 2011,

but my first trial was constantly being delayed by these early morning disputes that could have been resolved the night before.  So none of that.

All right.  My next page.  All right.  Now, have extra witnesses available.  This again was something I learned in my first trial.  I don't want to get to 3 o'clock in the afternoon and have a party say well, we expected to have this witness go the rest of the day, but the cross-examination was short, and, therefore, we're out of witnesses.  If that happens, I will charge your side for the remaining time and the time that we would have adjourned for the day.

Now, you are -- as I understand the pretrial order, you are going to be informing counsel, I think it is two days before the day a witness will appear as to who will be appearing.  I want you to make sure and confirm with opposing counsel the day before as to whether that's still the case because sometimes there is fluidity, sometimes things move more slowly or more quickly.  I want to make sure no one is surprised by who shows up on the witness stand the next day.

Breaks.  I will take one break in the morning, typically somewhere between ten and fifteen minutes.  I will take a lunch break of forty-five minutes.  And I will take an afternoon break of ten to fifteen minutes.  I will want

for lunch, and this is the only way to make this work, particularly after the COVID adventure, the number of restaurants in downtown Delaware close to the courthouse has diminished, and the number of quick restaurants is definitely down, and we're pretty much down to Jimmy John's which is not -- well, I won't say what it is not.

Now, so I want you to provide jointly a lunch for the jurors.  It doesn't have to be an elaborate spread, in fact preferably not, and you obviously do not identify which of you the particular lunch on a particular day comes from, but I want you to do that.  I recognize that it's a cost, but the cost is minimal in comparison to some of the other costs that are inevitable here and unavoidable.

On binders, you probably will do what everybody else does which is to prepare binders for witnesses.  You don't have to prepare dozens of binders.  One binder for a given witness for me, my law clerk does not need another binder, so the witness will need a binder, obviously, and I will need a binder and opposing counsel will need a binder, but other than that, try to keep the number of binders to a minimum because otherwise we are awash in binders by the end of the trial.

Juror notebooks.  I would like you to prepare notebooks for each of the eight jurors which will contain some pages, lined paper pages for them to take notes if they

wish to take notes.  And also what I think is very helpful, although we have few witnesses in this case, this may not be as necessary as it is in a multiple witness case, but I think nonetheless, pictures of each of the witnesses, photos, that will remind the jurors when they're back in the jury room of who was who, particularly helpful for witnesses who were maybe on the stand for rather less time than others because I have had jurors complain that they just couldn't remember who Mr. Sellers was, let's say, and Mr. Sellers turns out to be a witness that the jurors are really concerned about.  So if you would do that, that would be helpful.

Now, if time goes according to plan, we should be done with the evidence ideally by Thursday afternoon, but possibly bleeding over into Friday.  I will, and I said earlier to you on Wednesday, I will conduct the formal trial instruction conference on Thursday afternoon after court. That is the conference, unlike the Wednesday conference which is an informal conference in which we will just discuss the charge that I will offer you as a proposed charge.  That Thursday conference will be an opportunity for you to make your final objections.

I take rule -- the rules of waiver very seriously.  If you don't object at the formal conference and if you don't provide me with an alternative to the charge

that you object to, then I will regard the objection as waived.

Now, one thing I don't want to have. I may make some changes between Thursday's conference and Friday morning, assuming we get done with the evidence, but it will be sometime early on Friday preferably. I may make some changes in the instructions. However, any change -- any instructions that I have not changed, I don't want to hear objections on Friday morning on those instructions. Changes that I have made you can be object to, but what I don't want is to have somebody come in as has happened on a couple of occasions with me on Friday morning and say, you know, Judge, we have been thinking about the instruction number 27 that we didn't object to yesterday, but we now have three objections and the jury meanwhile is sitting in the jury room wondering what is going on. If you don't object on Thursday to an instruction that is unchanged on Friday, you have waived it.

All right. Now, let me ask you whether you would prefer to have me charge the jury before your arguments or afterwards. I can do it either way. If I do it before I give the charge, you have your argument and then I give a brief concluding message to the jury dealing with how they should go about deliberations. If we do it the other way, you argue first and then I give the charge. I'll

hear from either side, what's your preference?  You don't have to make a decision now, but just for information tell me what you prefer.

Plaintiff.

MR. WINES:  I don't have a preference at this moment, Your Honor.  I have never seen it done the way before you're proposing where the instructions are before the closing.  I might be interested in it if I can have a chance to consult --

THE COURT:  Sure.  We don't have to do this.  I wanted to put this on the table because I don't want to pop it on you on opening morning.  Let me tell you what most people end up opting in favor of and why.  My experience is most people want the charge first and the close afterwards.  And the reason is they want to be able to say as the judge has charged you, dot dot dot.

MR. WINES:  Yes.

THE COURT:  Not as we expect the judge will charge you.

MR. WINES:  Right.

THE COURT:  So that's what I think most people opt for and I'm fine either way.

Defendant, do you have a preference?

MR. PALLEY:  I think we prefer that you charge the jury first and then we close for the reasons that you

just articulated.

THE COURT:  All right.  That's what we'll do. Unless absent the change of mind, that's been the way most people want to do it.

I think I mentioned the system of jury selection I used.  Again, mostly exactly what the other Delaware judges do, which is that I put fourteen people in the box, and then I ask the entire venire questions all of which are designed in a way that a yes answer to the question is -- provokes a further inquiry, a no answer does not.

So suppose we get seven people in the box who have no yeses in their answers, then I will turn to those who have yeses and ask them what the yeses were, and then ask questions to explore the reason for the yeses.  And at that point we'll have a bench conference after we've explored the yeses and you all can make your requests for striking for cause any of the jurors who responded yes.  If any of those jurors are struck, then I will call more jurors to replace the struck jurors and I will ask them the same question, how many yeses are there, and they will respond and we'll go from there.  We go -- typically this does not take very long which is one of its great benefits.

We will wait until we get fourteen people in the box and the fourteen will then be the group that will be subject to the peremptory challenges.

Each of you will have three peremptory challenges.  My preference, my system that I have used most successfully is blind strikes which means that each of you strikes three without consulting the other side.  Very seldom have I had overlapping strikes, double strikes.  I have had that happen once or twice, but it's unusual.

Nonetheless, if we end up with six strikes, a total of six strikes that gets us down to eight and those are our eight jurors.  If we end up with one more, then we have a couple of choices and I will leave this -- we can discuss this at the time, but I leave this to you to think about.  We could go with nine if we have say one overlapping strike.  There is some virtue in having a little bit more leeway.  The eight is I think a workable number in that you get collaboration without increasing unduly the chance of some juror have an idiosyncratic reason for not wanting to go along with the rest.

On the other hand, we can't go below six, so if we have somebody has got the flu and that person and two others can't arrive on Tuesday, then we're sort of out of luck absent a stipulation.  So that -- this is unlikely to come up, but I thought I would throw it out there for you to consider.

All right.  That is the process from my perspective.  Why don't you tell me, starting with the

Plaintiff, if you have any questions about the process, and then we'll go into the pretrial order.

Plaintiff.

MR. WINES:  I do not, Your Honor.  Mark, did you have any questions?

MR. BILLION:  Only, Your Honor, when will we be distributed the juror questionnaire?

THE COURT:  The morning of the jury selection.

MR. BILLION:  Wonderful.  Thank you, Your Honor.

THE COURT:  Yes.  You'll have an opportunity, as I will, to look at the jury questionnaire which is -- has their, as I recall, it has their employment, spouse, marital status, I believe, obviously geographic location, not much. It's not a complete accounting, but it has enough information that you have a general idea of what kind of person you have.

All right.  Anything else?  Anything that you would like to suggest that I haven't covered?  I am interested in hearing.

If not, Defendants, anything?

MR. PALLEY:  Nothing from defense.  Kody, do you have anything?

MR. SPARKS:  No, Your Honor.

THE COURT:  That's fine.  Hello.

Okay.  Well, then, we're all done with the

preliminaries.  Now, let me go into the pretrial order. Here is what I am going to do.  I don't adopt the exhibits, what I adopt and what I sign is the order itself.  The exhibits are your position on things and that's fine, I will have something in the order that will say that the exhibits constitute the parties' presentations on these various issues.

And obviously some of the exhibits have been overtaken by events, but I don't want to go through all the exhibits and make changes conforming to things that have happened and anything that I do or don't like about the exhibits.  Those are your business.  You filed them.  They will be -- they will remain on file and available if need be, if somebody wants to look at the situation later.  But the part that I will sign will just be the order itself, the 22-page order that you have, draft order that you have provided.  So that's the part that I am going to talk about. Most of it is fine.  I don't have a problem with most of it. I will make a few changes here and there inconsequential.  I will take out most all of the footnotes which were meant as commentary I think to inform me as to bases for maybe disagreements or positions taken by the parties but are not necessary to an understanding of the pretrial order.

The place where I have the biggest concerns and I have already enumerated this point, which is the timing of

raising things with the Court, objections to demonstratives, objections to things that are going to happen in the next day and that's where I will go ahead and make changes.  I'll give you an idea of what they are.  You'll see them.  They will be consistent with I hope what I'm saying now.

I started paragraph 55, which is on page 12 of your drafts.  Parties shall provide demonstrative exhibits to be used in connection with the direct examination by 6:00 p.m., not 7:00, one calendar day before their intended use.  When you say one calendar day, the way I understand that and have always understood it, that means on Tuesday evening for Wednesday use.  So as long as -- there have been occasions in which people say well, one calendar day means more than just the next morning it will be used, but no, I think one calendar day means Tuesday for Wednesday use.  Two calendar days means Tuesday for Thursday use.

All right.  And this is to happen, there will be -- I will change the language a little, but basically the meet and confer will occur shortly after that -- well, I'm sorry, I skipped a step.

Objections to any demonstrative exhibits will be made by 7 o'clock local time that same day.  The parties will then meet and confer and will present any unresolved issues to the Court by e-mail, and you have my e-mail, no later than 8:00 p.m. the day before the event such as the

witnesses being called.

I hope you will exercise restraint in this regard.  This is one of the main reasons we have had a lengthy discussion of issues last Wednesday and that you will have an opportunity to digest the pretrial orders I will enter later this week, I hope today, tomorrow to give you an opportunity to adjust your cases in accordance.  But that is the protocol that I want to follow with getting to me with any problems.

Basically, I am going to follow the same pattern with respect to the other objection.  Let's see, I guess there is really only one other paragraph, I guess 56.  I will want the objections to exhibits and demonstratives to be made by 3 o'clock local time the same day that you get them.  Make objections by 4:00 and present any unresolved issues no later than 6:00.  This is with respect to any demonstratives that are to be used in connection with the opening statements.

All right.  Let me keep going.  We obviously have an ongoing dispute about the question of whether some witnesses will be presented either live or through deposition on more than one occasion, so I'm just taking paragraph 61 out just so this doesn't create some kind of expectation that this issue has already been resolved.

One other the thing, to remind you, again, I say

this only because I have had a problem before with people thinking well, you know, the session we had on Wednesday was just sort of tentative and the judge was just expressing his tentative views.  When I was tentative or when I was withholding a ruling, I said so.  On other ones in which I ruled, that's the ruling on those exhibits.  I don't want to see arguments that well, you should really admit this exhibit or you should exclude this exhibit notwithstanding your previous ruling.  Those were the rulings on the exhibits, so I don't want to get embroiled in a lot of going back over plowed ground.

67 deals with depositions.  Now, I assume, I am not quite sure what this is intended to address, other than the possibility, I suppose, of some change in the nature of the case that provokes one of the parties to want to change the deposition designations.  Am I missing something here? Are we going to have only -- well, I guess it's either Chen or Risler depending on resolution of those issues.  Is there anybody else that is going to be testifying by deposition?

MR. WINES:  No, Your Honor.  I think this was contemplating that the parties have exchanged the universe of potentials and that by this date you may have trimmed it down.

THE COURT:  All right.  Well, then, I'll just take out 67.  Is there any reason for it?

MR. WINES:  Fine by me, Your Honor.

THE COURT:  Defendants?

MR. PALLEY:  That's fine, Your Honor.

THE COURT:  All right.  Out it goes.  Okay. Much of the rest I think is not a problem.  Some of this is backward looking, I suppose.  I'll leave in the certificate, certification of good faith efforts at settlement reading the way it is.

Now, I have indicated I'm using a slightly different system for jury selection, so I'm going to modify the jury trial paragraph according to what I have explained. Paragraph 99, order of presentation, there was a dispute about rebuttal.  And let me ask you, what is the point of disagreement on that?  What I perceive is that the Defendant wants rebuttal to be more narrowly circumscribed than the Plaintiff.  Give me your respective positions on that. Plaintiff first.

MR. WINES:  Well, I think the position that we put in 4 in blue is the standard recitation of how rebuttal presentations are supposed to go.  Perhaps you want to hear first from the Defendant on what their intended change to that standard --

THE COURT:  Why don't I do that.  Let me go to the defendants.  What is it that you are urging me to do with respect to rebuttal there?

MR. PALLEY:  Well, I think our position is that the Plaintiff doesn't have an absolute right to put on a rebuttal case and can't use a rebuttal case to retread or reargue things that are raised in its case-in-chief.  We're not saying they can't have a rebuttal case, this is a question from order of presentation standpoint, it's something that would lead to the Judge's discussion, that's the only point that we're making.

THE COURT:  All right.  I understand the point, and I don't think there is a huge disagreement with you, but I think I may play with the language and try to get the point across that rebuttal is designed to rebut, not to introduce new evidence, not to introduce new issues, not to introduce -- well, I say new evidence.  If there is evidence on rebuttal that actually does rebut something in the Defendants' presentation, then that's legitimate rebuttal even if it is evidence that wasn't introduced before, otherwise what's the purpose of rebuttal.  But it does have to be rebuttal, it can't be a new issue that isn't really responsive to the Defendants' position other than simply it tends to favor the Plaintiff rather than the defendant. That's not really rebuttal, that's adding new matter to the case.

So I will try to articulate that in a way that is unobjectionable.  I don't sense that there is a huge

disagreement on that, but part of dealing with issues like that I think is a matter of -- depends on the facts on the ground when the issue comes up and I will try to adjudicate any disputes on that with the normal practice of rebuttal. So I will probably have tried to articulate something, but I don't know that I can anticipate any and all intentions.

Now, what remains?  As I mentioned, I will have an order for you on the exhibits and I will -- I anticipate, I have gotten through most of it.  I will anticipate that I will be ruling on most of the exhibits.  I have your supplemental submissions on Exhibit 10 and Exhibit 80 and 81.  And I would anticipate -- I will either get that to you this afternoon or tomorrow.  Don't hold me to any of these times because that's -- I have got a number of things I have to tend to not relating to this case, but I will do my best.

MR. PALLEY:  Your Honor, excuse me.

THE COURT:  Let me just finish and then I'll open this up for questioning.

There will be a handful of the exhibits that I anticipate what I will do is wait until the context is settled through the sponsoring witness, the evidentiary context in which they are offered and so forth, and I may not be able -- in fact, I'm very confident I will not be able to rule on those today, or in my order, but they will be a small number, and I will let you know what I am looking

for.

So I will also give you the deposition designations, but we've already covered those, so I don't expect any further debate over deposition designations, other than the question that we talked about on Wednesday about what to do with Mr. Chen's deposition.

Okay.  Now, somebody had a question. Mr. Palley, was that your question?

MR. PALLEY:  Yes, Judge.  And forgive me if this is out of order.  This is a housekeeping matter, other than --

THE COURT:  There is no such thing as out of order.  We'll take any issue as it comes up, I just want to make sure you have as much information as you need.  And fire away.

MR. PALLEY:  Yes, Judge.  I think both sides submitted proposed -- have submitted motions and proposed orders allowing lawyers and their staff to bring in electronic devices.

THE COURT:  Right.

MR. PALLEY:  Not all the lawyers are current.  I just want to mention that.

THE COURT:  Right.  We will enter those orders either today or tomorrow, but they will be entered.  You will have copies of them in your hands to present to the

CSO's if they challenge you.

MR. PALLEY:  Thank you, Judge.

THE COURT:  Okay.  Anything from the plaintiffs, any further questions, because I have a couple of things I want to get some presentations on.  Anything from either side?

Okay.  All right.  Now, it will not surprise you to learn that there are still a few of the MILs -- I have studied the MILs closely and I have some views that I still want to give some further thought to, but I have a fair confidence with respect to most of the MILs.  There are a few that I want to get further enlightenment from you.  I have a limited amount of time, but I want to give you an opportunity to enlighten me with respect to things I felt I still needed to get more information on.

The first one is defense MIL 6 which is actually more than just that MIL.  It relates to the HKID, the know your customer, the anti-money laundering issue, which I am viewing as all a piece.  And the MIL itself is the MIL that relates to calling Mr. Palley as a witness.

So here is my -- let me give you what my tentative thinking on this is.  Well, I tell you what, I will -- rather than starting off with stating an opinion, let me hear from Mr. Palley or someone from the Defendants' side as why is it that these issues are important enough to

warrant inclusion in the trial, by which I mean with KYC and AML.

MR. PALLEY:  Yes, Your Honor.  The fact that he used a fake ID card is an issue that goes to the witness's credibility, which is something that is always, always relevant, is appropriate to offer under Rule 608(a).  I believe it's certainly fair to say, of course, that doesn't mean that you can use collateral evidence, or additional evidence to support that in questioning the testimony.  So I understand that issue.  Mr. Billion brought that up at our meet and confer.

The way I pose it is this.  Mr. Wang testified in his deposition that he used a fake identification card in connection with, I would call it in front of the jury a transaction or potential agreement with Injective.  I don't even need to mention KYC.  So we have testimony to that effect.  And the testimony is the thing that would prove that, not the identification card itself.

This doesn't get into settlement discussions.  I actually believe that 408 is at issue because 408 is evidence about compromise offers or negotiations to prove or disprove the validity of or the amount of the disputed claim or to impeach by a prior inconsistent statement or contradiction, we don't intend to use it for that purpose.

THE COURT:  Yeah, I don't think the problem is a

408 problem as I see it.  But enlighten me, though, I had understood that the incorrect address on the HKID was something that both parties understood, that this was a work around that the Chinese ID card didn't work.

MR. PALLEY:  No, Your Honor, there is absolutely no evidence to that effect.  What happened was exactly as we articulate in our papers.  After an attempted mediation, which is actually a topic that doesn't need to be raised in questioning, I was sent a link by my client.  I sent that link to the Plaintiff's lawyer at Reed Smith.  We, in fact, believed that he was a residence of Australia.  He provided an Australian lease at some point.  I believe that's the evidence.  And he was not able to complete that form.

He testified during his deposition that he did use a fake ID.  It's common to use a fake ID.  Everybody knew that he lived in China.  He can certainly say that on redirect.  I don't even need to ask him about -- I don't even need -- the questions that I could ask him are as follows:  You used that identification card that was not yours to satisfy regulatory requirements in a potential agreement with Injective, correct?  The answer to that is yes, that's undisputed.  He testified to that end.

There is some very long answers with a lot of explanation blaming other people for it, but he also said my next question would be according to you everyone does this.

It would certainly be appropriate, what I would do if I was Mr. Wines on redirect, I would say why did you do that.  He could say well, it was a setup, they knew.  The testimony, I believe that's very much a matter that's in dispute again.

The entire case is not about this, but as I have said before, this case is in any many ways a swearing match, one side says one thing happened, another side says something else happened.  And this goes to --

THE COURT:  I'm sorry.  Go ahead.

MR. PALLEY:  And I would say to the question of calling me as a witness, again, I was an outside lawyer forwarded a link.  The person who knew the most about why he used a fake ID is the Plaintiff, or Plaintiff could certainly call as a witness the lawyer from Reed Smith who was involved in this.

But the notion that I have some special knowledge about his resident is pure *ipse dixit*.  I know nothing.  The only time I spoke with the Plaintiff was when -- during the two times I deposed him.  I don't know him.  I didn't speak to him about any of this.  There is no allegation that I did.  And suggesting that this is a problem that I created in their response to our motion in limine is a creative argument.  We were accused of I believe the word was palpable desperation in some of the briefing --

THE COURT:  That isn't, by the way, a subject

that -- I mean, this is not a one-way street, but there has been a lot of rhetoric at various points in this and that's one of them in the case.  I want to put a damper on the rhetoric for the purposes of the trial.  I have -- again, I talk to jurors after each trial, and it's very informative as to what they like and what they don't like.  And they really don't like overblown rhetoric.  So it is not in your interests, either party, it's not in your interests to use these incendiary, this incendiary language in any context for the jury.  Let's keep it civilized.  Let's keep it calm.  No overstatements of the weakness of the other side's -- just tell the jury why it is that your case is stronger than the other side's case.  And believe me, they, and I, will be much more comfortable in making an intelligent assessment of the case than if they have to deal with a lot of people that are using over-the-top rhetoric.

And if I feel that there is something going on that is beyond the scope of permissible, legitimate language and argument, then I will call it out.  And I don't want that to happen and neither do you.  But that's -- let me move on, though.

MR. WINES:  Did you want to hear from Plaintiff?

THE COURT:  One more question on this, which is my understanding was that Mr. Chen knew that Mr. Wang was not a resident of Hong Kong, that he was a resident of I

guess Shanghai.  Is that right?

MR. HARTTRAFT:  That's our understanding, Your Honor.

MR. WINES:  It's not just our understanding, Your Honor, that's what Mr. Chen testified to in the 30(b)(6).  You can see it in the designation, I believe.  I was just trying to find on my desk the depo designations.

He testified of course he knows that he's in Mainland China.  He I believe met with him in Shanghai.  He hired him to be a consultant in Mainland China to try to solicit investment in Mainland China.  He was then delegated to Mr. Chen's -- supervisor responsibility Mr. Chen delegated to Xinran in Mainland China to supervise Mr. Chen in Mainland China along with the other consultants they had in Mainland China.  The idea that they did not know that he was in Mainland China is not true.

MR. PALLEY:  Your Honor, they did not know that he was using a fake identification card.  I believe the evidence on this is disputed.  I understand Mr. Wines' point.  It's really two questions.  It's a credibility issue.  It's one brick in a wall of credibility.  They can certainly explain all this on redirect.  We don't need to mention that this was in the context of a settlement discussion.  If they want to say -- they can cross Mr. Chen on this, you knew, it's -- it goes to admissibility.

THE COURT:  Yeah, the settlement negotiation issue I do not think is an issue.  I think if this evidence comes in, it has nothing to do with disclosing matters discussed in settlement any more than evidence that was used by the parties to discuss the strength of their speculative claims.  That happens all the time, obviously, and that doesn't make it 408 evidence.

MR. WINES:  Except, Your Honor, if I can push back just a tad on that to explain why I believe it matters.  You heard Mr. Palley say that this ID was used to satisfy regulatory requirements.  That's not what it was used for.  The context here was an attempt to settle SAFT claims that are no longer in the case.  This leak was sent to Mr. Wang's counsel saying in order to receive the tokens you're due under the SAFT as part of the mediation that was just completed we need you to upload your ID to this link that does not accept uploads from Mainland China.

In the context of a settlement that has been preliminarily agreed to with opposing party who knows he is in Mainland China, it matters that that's the context in which this was done, if it were to come in, which obviously we argue it should not come in.

This is not him submitting it for compliance with some regulatory requirement, right?  I mean, it makes a difference.  And if we're going to give that contextual

explanation, we have to get into the fact that this was occurring as part of settlement because it explains to the jury that this is not an adversarial or regulatory process, but rather an attempt to get something done in order to satisfy a mutual agreement, a mutual objective at that point, it obviously broke down afterwards, but at that point what was a mutual objective of the parties.

THE COURT:  Well, that's not the way I'm viewing it.  It seems to me that the settlement facet of this issue can be left out entirely because what's really going on is the Defendants are saying that he is a dishonest person because he used this card.  And he is saying that the fact that he used the card was simply a consequence of this requirement that he use some kind of identification and the refusal of the regulatory agencies to accept the Mainland China card.

Now, that strikes me as having nothing to do with the settlement.  And I don't see why the settlement has to come into this at all.  And I particularly don't see why Mr. Palley's participation has anything to do with it.  Mr. Palley is not going to be used in the debate.

MR. HARTTRAFT:  Your Honor, if I may jump in on that.  Mr. Palley says there is no evidence that anyone knew that this was a workaround.  Well, that's just not true.  Mr. Wang in his deposition testified that that was the case.

Mr. Chen in his deposition testified I don't know, I don't recall, I don't know, I don't recall, to one question after another regarding the use of Sinnaps.  And he also testified that to the extent Sinnaps was used, he relied on his attorney, his attorney being Mr. Palley.  So for Mr. Palley to sit there and say that Chen can testify about it, well, he's already testified that he doesn't know anything about Sinnaps.  Mr. Palley is the one with the information as to the context and use of Sinnaps, why it was used, and --

MR. PALLEY:  Your Honor, Mr. Harttraft is calling me a liar.  I had nothing to do with Sinnaps.  That was a link that was provided to me by Injective.  I am saying this -- I'm saying this as an officer of the court, subject to Rule 11.  I did not pick that KYC provider.  And I don't want to get into overblown rhetoric, but for Mr. Harttraft to say that this is something that I knew about without any basis is something that with much respect, and I appreciate that this is an important point for the Plaintiff, and I understand the advocacy, it is simply not true.  I did not have anything to do with that, Judge.

MR. HARTTRAFT:  And I want to make clear that I am not calling him a liar.  I am just reciting what is in Mr. Chen's deposition, what he testified to.  So if he's saying his client is a liar, then that's fine, we can talk about it in court.

MR. WINES:  Your Honor, we've gotten a little far afield.  Right?  It doesn't --

THE COURT:  Yeah, I think we have gotten far afield.

MR. WINES:  It doesn't begin and end with the fact that this ID was transmitted three years after the facts at issue in an attempt to settle SAFT claims which had an AML KYC requirement, a requirement that is not in the consulting agreement.  Right?  How is this not a collateral issue.  Right?

THE COURT:  Well, the fact that it was for purposes of settlement is what I am not seeing --

MR. WINES:  Right.

THE COURT:  -- has to do with anything.

MR. WINES:  That's why I'm saying let's step --

THE COURT:  The 408 argument it seems to me vanishes.  So what's important is whether -- never mind that this was part of a settlement effort.  So he made a false statement, let's say, just to take -- put the point as strongly as it could be put for the Defendants.  And that's a false statement that he made without regard to whether this was in the context of SAFT, whether it was in the context of something that has been waived, whether it's in the context of some entirely independent transaction.  It is a false statement.  The question is, is the context such

that that false statement has any real significance for purposes of his credibility. And that's what I'm struggling with.

As far as I'm concerned, 408 goes out. Mr. Palley as witness goes out. And I'm left with just the question of whether a statement on a form here, using the HKID and putting a false address in there under these circumstances bears sufficiently on his credibility to allow it in, given that it launches us into a long explanation of the circumstances of why it was used. So it seems to me that at this point I am not persuaded that the game is worth the candle.

Okay. Well, I have your arguments on that. I will think about it further. But that's where I am.

As far as Mr. Palley is concerned, I am not going to require him to be a witness. So he doesn't have to worry about that or any exclusion from the trial and so forth. That would be I think terribly disruptive and unjustified.

Okay. Next issue is the MIL -- I don't have the number, but you will know it, the MIL dealing with whether the option to purchase is still open. Tell me which MIL that is.

MR. WINES: Defendants' 2, Your Honor.

THE COURT: Defendants' 2. Okay. Now --

MR. PALLEY:  Judge --

THE COURT:  Defendants, why don't you tell me, why is this something a jury needs to address in this case?

MR. PALLEY:  It's pretty simple.  And I think we may actually have a resolution on this based the response in papers.  During the Plaintiff's deposition, he testified that he was ready to go through with this SAFT transaction now and can provide proper ID.  My understanding is that he is not going to make a similar statement during his direct examination, that he's ready to exercise an option to purchase.  If that's the case, then I guess the motion is moot.  We were not seeking an advisory opinion about -- for purposes of that motion, Plaintiff responded that we were actually seeking an advisory opinion.  This was really a matter of seeing what had happened during his deposition and trying to prevent that from happening at trial.  If it's not an issue, I guess the motion is essentially moot.

THE COURT:  All right.  Mr. Wines.

MR. WINES:  I agree that we are not soliciting on direct any evidence regarding the continued availability of what Mr. Palley calls an option.  I can't predict what Mr. Palley may ask him that will solicit answers that he opens the door for, but as part of our affirmative case, because obviously it's not an issue that the jury is being asked to decide whether or not the contract is still open

today.

THE COURT:  Well, in that case, I will -- go ahead, I think there was another comment.  Mr. Palley, did you have something further?

MR. PALLEY:  No, I think we're on the same page.  Whether or not the door is opened, we'll cross that bridge when we get there to mix metaphors.

THE COURT:  Yeah.  I do that all the time.  I'm sympathetic.  We will regard that as resolve.

Now, the last question -- actually it's two issues and it will not surprise you to learn that the issues that I am finding the most challenging in this case are what to do -- I think the issue, the issue, the most difficult one is the one that we spent some time on Wednesday talking about, which is the 32(a)(3) issue.  I think both of the briefs that I got I thought were quite good and done under time pressure.  I wonder if Mr. AI made an appearance at some point in all of this, but --

MR. WINES:  You can't trust that guy, Your Honor.

THE COURT:  Huh?

MR. WINES:  You can't trust that guy.

THE COURT:  No, you can't.  And in fact, usually, I have noticed in looking at briefs that I was pretty sure were AI generated that the best way to tell is

to find the case that has absolutely nothing to do with the issue --

MR. WINES:  One hundred percent.

THE COURT:  -- and bingo, that's the best proof. I don't mean to defame the authors who may have found all of this by sedulous plowing through Westlaw.  But in any event, I found the briefs to be helpful.

What I found also, however, was that in a sense they passed each other in the night.  It is certainly true that as I think the Plaintiff's brief emphasizes that Rule 32(a)(3) authorizes the use of a deposition of a party. That's what it says, and it says for any purpose.  So it's authorized.

The question in the presentation made by the Defendants is, but should I allow it, or if at all should I allow it in some form in this case as part of the Plaintiff's case such that the first appearance of Mr. Chen is in the form of a deposition which is followed somewhat awkwardly by a reappearance in real life.  It seems to me those two positions are not necessarily inconsistent.  The rule that 32(a)(3) stands for is basically saying you can use it, but it doesn't say at any time, it doesn't say for -- regardless of whether it's disruptive, et cetera, and in fact a number of the cases have said well, not, for example, if it's duplicative and so forth.  This presumably we can

deal with the duplicative part.

The part I'm having a problem with is the problem of sequencing.  I mean, I would have no problem at all if the parties agreed that the deposition would come in, and again, for substantive, not just impeachment, but for substantive purposes as part of rebuttal and that would seem to me to solve the 32(a)(3) problem.  But the Plaintiffs want to put it in their case and that's where the awkwardness, the inefficiency, the fact that you are getting ahead of the live testimony of the witness is something that you don't see in many of the cases that were cited, if any. There is some suggestions in some of them that that ought not to be something the district judge should permit, but there is nothing that says there is an absolute right as far as I can see, and if there is, I would like to have a citation to the particular case that says it's an absolute right in a situation like this for the Plaintiff to put the deposition in before the Defendant, of the Defendant, before the Defendant gets to call the witness live.

Do you know if there are any cases that are cited that stand for that proposition?

MR. BILLION:  Your Honor, there is not an absolute right to do anything.  This Court retains its jurisdictional discretion under Rule 611, there is --

THE COURT:  Right.

MR. BILLION:  There is no doubt about that.

THE COURT:  That's right.  What I'm looking for is guidance as to how I should exercise that discretion. Mr. Palley and I believe others at the session on Wednesday were basically saying sure, you can do this and, you know, you would probably get away with it, but that's not fair to put the Defendants in this position.  So that gives me food for thought.  And I have been struggling with it since.

So anything -- you're right, Mr. Billion, it is not something that I lack discretion to do.  But I don't want to do something that is a bad exercise of discretion, even though the Court of Appeals might hold its nose and say well, it wasn't an abuse.

MR. BILLION:  Your Honor, yes.  So two things. One is you had asked whether there was an absolute rule. The answer is no, Rule 32 says may, this Court retains discretion.  When you look at Defendants' file what you will notice is there absolutely no reason for us not to do this. They mentioned cumulative evidence, but obviously cumulative evidence could be handled when Mr. Chen testifies.  If we're asking the same questions twice, the Court can intercede at that moment.

As far as disjointed or confusing testimony, again these statements are made without any backing at all. There is no this is what's confusing, there is no this is

what is disjointed.  They simply want a do over.

And the answer is is that Rule 32 is actually set up in such a way that this is precisely why we're supposed to be able to use it.  It provides for a truth telling function of the Rule 30(b) deposition as opposed to simply a do over if you don't like the results you got as the person being deposed.

Wright & Miller is very clear that the fact that a witness is available, which is the only thing they have proffered, is not enough to deny the opportunity to show this deposition.

And I understand they've made other statements, but they are all because Mr. Chen is available this will be more confusing because Mr. Chen is available, but they don't really explain why, it's not a particularly --

THE COURT:  I don't want to put words in Mr. Palley's mouth.  He's articulated the point well on Wednesday.  But my understanding of their position is not so much that it's just that Mr. Chen is available, it is that it is awkward, difficult for the jury, and ultimately unfair to the Defendant to have the deposition come in first and then have Mr. Chen testify after the jury has heard this long deposition.  I don't know how long it even runs, the deposition, but it looks like it could be lengthy, and have him introduced into the jury in the deposition and not from

the stand.  And I -- as far as trial tactics, I understand that concern.

And I'm not sure that the Wright authority, Charles Alan Wright, is really addressed to that point.  All that says, just Judge Haynsworth's opinion which is all that Wright cites stood for the proposition that yes, you can introduce the deposition of a party who is available, that's fine.  That's a rule.  But it doesn't go on and say and in the following circumstances such as the circumstance before us, it's perfectly okay and, in fact, preferable to do it that way.

So I'm asking do you guys have a case that I can look at that has these facts on it?  And I haven't found one yet, but I can't say that I have read every single case in this area.

MR. BILLION:  Your Honor, I have read a lot of them.  I think the issue is is that we're moving -- we would like it to be shown to the jury precisely because it helps us prove our case because it has facts in it that are important to us and because at the end of the day it's the most efficient way to do it.  What Injective is saying is that our witness is particularly unattractive on this particular deposition and we don't want it shown.  And the answer is, Your Honor, we could show this in opening.  I mean this is a statement of a party opponent.  This is in

all ways appropriate evidence.  This is substantive evidence that we would be deprived of showing because they're claiming that it makes their client look bad.

THE COURT:  Let me interrupt for just a second.

MR. BILLION:  It could be handled on direct with their witness, they can call him.

THE COURT:  Let me interrupt for just a second here.  The question is not whether you can use his deposition or not.  I would have no problem with you using it in rebuttal.  The question is timing.  Should you get to go first with the deposition which is, as all the authorities and certainly Wright is included regard as second value evidence compared to live testimony, or do they get to go first and then the jury sees in rebuttal the deposition.  Why not the latter as opposed to the way you want to do it?

MR. BILLION:  Because, Your Honor, it's our case.  The Defendants --

THE COURT:  Let me hear Mr. Billion out.  I'll come back to you, Mr. Palley.

MR. BILLION:  We are allowed to present our case with the evidence that we -- pardon me, with the evidence that we have generated in our time.  I mean, the answer is we are with a limited time.  We are in a situation where we didn't introduce this witness in a certain way or do

something in a certain way.  This witness has chosen to introduce himself.  And so because of that, we are going to go forward.

I don't believe that the witness is allowed to get up and say, or that anyone is allowed to get up and say well, this didn't make my witness look good, we would prefer to have him introduced in a different way and it's prejudicial.  This is this man's testimony.  He is testifying on behalf of the company so these are now the company's words and we want to play them for the jury.

THE COURT:  I understand that.  Let me ask you the question this way.  In what way are you worse off for having his testimony, his deposition testimony played in rebuttal rather than in your opening?

MR. WINES:  Mark, if you give me a second.  Your Honor, this --

THE COURT:  This, by the way, at trial, this is a no, no.  We'll do it now, but no.

MR. WINES:  I agree.

THE COURT:  No ganging up on the poor judge.

MR. WINES:  I agree.

THE COURT:  But go ahead.

MR. WINES:  The plan, Your Honor, as Mr. Billion said, we have an obligation to make an affirmative case. Mr. Palley can make a motion for judgment at the conclusion

of our affirmative case.  This is the testimony of not Mr. Chen, but of Injective that we believe helps prove our case.

THE COURT:  Well, that's the argument I thought, actually that I thought was going to be made which is come Rule 50 time, is Mr. Palley going to be able to make a more powerful motion when you have been required to hold the Chen deposition in your back pocket.

MR. WINES:  Right.

THE COURT:  This is not the kind of case that I suspect will go off of Rule 50, but that would be a concern I think that I would have if I were in your position, if it's a realistic concern.  But in thinking about this, I have had to wonder well, how realistic is that?  Is that just a debater's point or is it a real concern?

MR. WINES:  I have another practical issue, Your Honor, is if I'm waiting to hold the Injective 30(b)(6) witness testimony until rebuttal, does that -- that puts me in a position where do I have to cross Chen again on all of the things that are already said in that 30(b)(6) testimony?  The idea of this being inefficient is upside down.  Right?  I have gathered significant evidence that helps me prove my case.  It took eight hours to get that fifteen, ten minutes worth of testimony.  And as you may recall, we had a lot -- we had a lot of issues with the performance of Mr. Chen and

whether or not he was actually prepared properly as a 30(b)(6.), but besides that, we were able to get this relatively concise evidence that we believe helps prove our case.

If I have to in the moment, again, talking about the prejudice to Mr. Palley and his presentation of his case, let's think for a moment about the prejudice to my case. If I have to wait for Mr. Chen to take the stand, say a whole bunch of things that are contrary to the testimony that he previously provided, do I now -- now my cross goes from being, you know, a tight two hours to have to show him the testimony again, and then get his response to the impeachment, show him the testimony again, over and over and over again in a fell swoop. Right? When it could have been done in a fell swoop. If I have to wait to rebuttal, then it loses its connectiveness to Mr. Chen and doesn't have the power.

So I'm put in an untenable situation, I have evidence in the can. I now can't present it until rebuttal. And instead, I have to -- Mr. Chen comes to the stand says -- again, I don't know that he's going to do this, but says twenty things inconsistent with his prior testimony. Now I have two hours of cross-examination that I have to do whereas if I had played the movie in my affirmative case, all of those issues will have been in the record.

THE COURT:  But that's one of the things that's concerning to me which is what -- suppose this plays out this way, suppose that I let you put Chen's deposition in and then in the defense case Chen testifies and he testifies in a way that's inconsistent with some of the things that he said in the deposition.  Do you then take his deposition, which the jury has already heard, and cross-examine him with the deposition, or do you just simply rest on the fact that the jury has heard and presumably will recall what he said in the deposition and you will be able to argue that there was an inconsistency between that deposition which they heard two days ago and the position he's taking now?

MR. WINES:  Well, I think I'm entitled to, again, point out that the witness has contradicted his own statement, but I wouldn't need to -- it won't take the same amount of effort, right?  I will say the jury has heard you testify, sir, the evidence that's already been presented.  Now you're saying blank.  Can you explain that difference.  Right?  It will be -- I mean, again, Your Honor --

THE COURT:  That's not the usual way that one conducts impeachment.

MR. WINES:  Well, of course, Your Honor, but again, as a witness in this case, right -- I mean, think of it this way.  I can and I have put him on my witness list, I can call Mr. Chen as a witness in my case.  Right?  He is a

witness with evidence that I want to elicit to prove my affirmative case, to meet my bar.  Right?  The fact that it's already been done just makes it more efficient.

There is nothing particularly unique about the deposition testimony that requires special treatment.  Right?  I can put witnesses in my case that have evidence that I think is relevant and I think helpful to -- probative to meet my, you know, required proof.  And that's what this is.  And it's efficient.  It gets it done.

I mean, Mr. Palley has raised -- the better question than asking whether or not this has ever been prevented is to ask, prevented on what basis?  Right?  Mr. Palley doesn't like the prospect of his client looking bad on video and then he has to put up his presumably more prepared witness this time to say things that are contradictory.  Right?  He shouldn't get an advantage out of that.  Right?  The evidence that is presented in the designations, that's evidence that exist.  It's in the record.  I get to put evidence in the record in my case.

THE COURT:  Okay.  I think I have heard enough on this, but I want to go back to Mr. Palley.

Well, first of all, let me ask one more time whether it's Mr. Billion or Mr. Wines, you all between the two of you, and Mr. Palley, you can jump in on this if you have anything to offer, but I really do want -- I know that

Mr. Wines has said I'm not asking the right question.  Okay, maybe not.  But I still would like an answer to the wrong question.

MR. WINES:  Respectfully.

THE COURT:  Which I would like to know if you all have any case that is like this in the sense that the potential prejudice is putting in -- party A putting in the deposition first and then party B put in a position that they have to raise the conflicts with the deposition through live testimony.  Is there any of your numerous cases that have that fact pattern?  Because I haven't seen one, but I haven't read them all.

MR. BILLION:  Your Honor, I guess I'll answer it with this statement.  I actually did this in the Delaware Court of Chancery about two years ago and the court had no issue with it.  And I can certainly supply that.

As far back as the Microsoft antitrust cases they brought in Bill Gates' deposition testimony before he testified.  I don't think -- so while I can't --

THE COURT:  The government's appeal -- I mean, the government's case against Microsoft you mean?

MR. BILLION:  No, the state antitrust cases.  At least by the time that the circus made it to Iowa, Joel Hoffman would bring in Bill Gates' deposition testimony and he was also on the witness list, but his deposition

testimony kicked off.  So that -- I certainly can tell you it's been done.

And I can certainly also tell you it would seem to me that's the reason to do it because to the extent you are in a position where the witness is not going to testify, meaning we're going to do the deposition testimony first and then the witness will not be there, it would actually be admissible under (a)(4) and wouldn't be an issue.

So I would submit to you that actually each and every one of these cases involves a situation where we're going to present the deposition testimony at a juncture that may or may not be the same as when the live witness is played.

THE COURT:  All right.  I am going to give Mr. Palley an opportunity for the last word on this and then I think we have to move on.

Mr. Palley, the last word.

MR. PALLEY:  I have heard a lot of statements from counsel, my brethren, that suggest that I want this to go in because I think he was called a toxic witness and he's going to look bad.  The reality is this was a nine-and-a-half hour day.  There was, I don't know if there was a sixteen or twenty subject 30(b)(6) notices that the Court determined was overly broad.

Taking out curated questions and answers without

seeing the -- I want to say this in a very polite way -- excellent advocacy by Mr. Wines in the form of his questions which were sometimes very long and difficult, I certainly wouldn't have wanted to sit through that day as a witness, he's a formidable -- he is formidable at cross-examination. You don't get the full context, you don't see it, and the jury is entitled, I believe, to see the context in which some of his questions -- now as to the question of what happens if he gets up and he contradicts his testimony twenty times.  Honestly, Judge, that would be terrible for us.  Mr. Wines could get up in his closing and say, do you remember how I asked him twenty questions, each time I had to go and show him his deposition.  I mean, we certainly don't want that to happen.  Again, as I said before, it's purely a discretion call.

The Chancery case to Mr. Billion's point, and that's a great reference.  Of course, Chancery is not a jury, right, so it's different.  If this were a bench trial, perhaps the question would be different.

Look, we're not -- the bottom line is we're not terrified of this.  We don't think that Mr. Chen is any more toxic than Mr. Wang.  There is one of my favorite answers to a deposition question ever was I asked a very simple question and I got a speech from Mr. Wang that referenced Liechtenstein and said that (inaudible) both witnesses said

-- witnesses say things sometimes in the context of deposition that don't make sense at trial.

I'm not trying to prevent them from putting on their case, I just think all things considered under 611 and 403, it makes more sense for them to cross-examine him and if he lies, you know, heaven helps us, or if he contradicts himself --

THE COURT:  But what I'm hearing you say sounds like you would not have -- you would not like them to put the deposition in, even on rebuttal.

MR. PALLEY:  Well, Judge, I think we have to address that question --

THE COURT:  Is that your position with respect to rebuttal?

MR. PALLEY:  Judge, I don't want to not answer your question, my first -- one of my great teachers told me never tell -- always answer the judge's question.  I'm afraid conditionally what I have to say is look, at the end of their case and at the end of our case, if they believe that the deposition contains substantive evidence that hasn't been introduced and is appropriate for rebuttal, I am sure that Court will allow them to do that.  I may object, I think you'll probably overrule me, but I certainly won't rule that out as a possibility.

But I do believe that one of the great things

about depositions is you can lock in testimony and it's again, my point, Mr. Wines and Mr. Billion and Mr. Harttraft would be given a gift if our client got up and contradicted himself twenty times or was impeached twenty times.  I hope I can do that to their client frankly and that's one of the reasons we're not playing his deposition testimony because I just want to get up on the stand and cross-examine him.  I think that's a better position.

THE COURT:  You wouldn't contest that you would be able to play his deposition testimony even if you had him up, right?

MR. PALLEY:  I don't believe I could play it during their case-in-chief.

THE COURT:  But in your case, you could play it.

MR. PALLEY:  If there was substantive evidence that I was not able to get out on cross-examination, maybe. I am not entirely sure, though.  The question would be why didn't you just ask him that question during cross.  So I don't believe that I would have an absolute right to do that, no.  It would depend on the facts and circumstances of the case, Judge.

THE COURT:  Right.  Okay.  I think I have heard enough to give me some useful things to think about.  This is to me maybe the trickiest issue remaining in the case, but I will struggle with it.

I have one more area that I just would like briefly to discuss. I don't want to spend a lot of time on this, but the argument which is in -- let me see -- yeah, Plaintiff's MIL 2, the question of whether there are new defense theories that were raised, some as late as summary judgment. I know we previously had this issue come up in connection with the summary judgment order, I think Footnote 4 I addressed one issue and said that wasn't a problem. These are a couple of new issues.

Defendants, why don't you flush that out a little for me as to why this isn't a problem in your view. You're on the -- we're on the right page on Defendants' 2 -- Plaintiff's 2, I'm sorry.

MR. MILLER: Plaintiff's 2, Your Honor. This is Hayden Miller for Injective Labs. Not to contradict Your Honor, I read Footnote 4 as addressing each of the supposedly undisclosed defenses. So each of the affirmative defenses found in prior material breach. And the prior material breaches were each raised in the summary judgment brief, that's uncontested. Right? Plaintiff says -- cites to each of the three genres of prior material breach that we were arguing, and they stem from one being the confidentiality agreement, or provision in the consulting agreement.

The second being breach of the lockup provision,

so reselling within the lockup provision.  And the third being the I believe competitive, anticompetitive behavior that he was engaged in self dealing.

So the last two, right, each of these arguments were raised in the summary judgment papers that we submitted.  They're all framed as prior material breach. And Your Honor said that prior material breach was raised in summary judgment sufficient there is no prejudice.

But without belaboring the point about what the briefing record is, I think we can jump right to the heart of it which is these were all raised in summary judgement, so the question is under the law, whether Mr. Wang's prejudice prior art --

THE COURT:  That's the bottom line is prejudice.

MR. MILLER:  I think that their briefing actually proves that there is no prejudice.  For each of the affirmative defenses we have raised they have held up their hand and they say how in the world can this defense gain any traction.  The Consulting Agreement, of course, couldn't have been breached by reselling that occurred prior to the entry into the Consulting Agreement, ergo they have a defense, they're not prejudiced.

The provision relating to disclosures of confidential information, they say this isn't confidential information and it was disclosed in a context that was

permissible, ergo, they have an argument against us.  And the same relates to the other affirmative defense.

So you look at their argument and it actually proves that there is no prejudice which is the guiding star here for your determination.  And the case law is clear on this point that we have --

THE COURT:  Well, Mr. Miller, and I'm sure you know this, to say that someone has an argument that they can make about a point that was not previously raised doesn't mean that point may be raised because there is no prejudice.  They may not win that argument.  If the point has not been raised on a timely basis, now, I'm not suggesting that's the case here, it remains to be seen, but it is not a very satisfactory answer to say yeah, but they have some arguments they could make as to why they doesn't lose on that point.  If they're entitled to say it is prejudicial to put us in a position that we are exposed to a possibility of losing on a point that was never raised and we didn't get the opportunity as we thought we would be entitled to respond to this point, then I consider that to be prejudice notwithstanding the fact that they have some kind of argument that they could make.

MR. MILLER:  Your Honor, the point is well taken and I have two responses to it if I might.  The first one is they have arguments in response to it because the factual

record that was developed in discovery dealt with overlapping issues and so it was always known throughout this case that reselling was an issue. Your Honor specifically referenced that point in the Footnote 4 that we were discussing earlier.

The confidentiality provision as well was raised throughout depositions. Does this mean that we specifically pointed to that provision and raised legal arguments? No, that doesn't happen in depositions, but we put to Mr. Wang didn't you disclose this during deposition, aren't you that man now. And the information relating to the breach of the Consulting Agreement rest within the possession of Plaintiff. I don't know how we would have any discovery that would be relevant to whether he breached the confidentiality obligation or not, either Mr. Wang did or didn't, and it rest in records that he possessed and produced, either we have a case based on this or we don't. So the prejudice point being well, what counterfactually would have occurred differently had it been disclosed earlier, nothing in my estimation and --

THE COURT: Okay. Let me give the Plaintiff a chance to respond here briefly and then we really do have to cut it short.

So Plaintiff.

MR. WINES: Your Honor, in the footnote in the

summary judgment decision that Mr. Miller references, you found that prior material breach from resales, that Plaintiffs were on notice because it was in the declaratory judgment action filed by the Defendants.  Right?

If you look at that declaratory judgment action, you will see that Defendants allege that Mr. Wang had breached the SAFTs.  Right?  There is two sections in the declaratory judgment.  There is the SAFTs section and the Consulting Agreement section.  They say that they breached the SAFTs through this proxy investing theory, that that was where some of the money that was invested in the SAFTs actually supposedly came from Hunter and Xiaomai.  That was the theory advanced in the declaratory judgment action.

And then as to the Consulting Agreement, the declaratory judgment action said Mr. Wang had breached the Consulting Agreement by doing no work and that he was terminated.  Right?  So you couldn't get it like you did with regard to the resale of the SAFTs, Plaintiffs were on notice from the declaratory judgment action.

When we took the 20(b)(6) testimony of Mr. Chen, I asked him directly about this.  I asked him the Hunter and Xiaomai, those are your allegations that Mr. Wang engaged in resale of INJ tokens.  Mr. Chen *sua sponte* told me no, reselling of interest in the SAFTs.  And I said what's the importance of the distinction you're making there.  He

repeated a couple of times that what is being alleged with regards to resales is that Mr. Wang sold interests in the SAFTs.

If instead either before this or during the 30(b)(6) it had been made clear that those resale allegations supposedly also incorporated Mr. Wang supposedly selling his advisor tokens under the Consulting Agreement, I would have had a lot of questions, like the questions I posed -- asked Your Honor to consider last Wednesday.  How is it possible that he -- you know, I would have established that it wasn't possible for him to have resold tokens pursuant to the Consulting Agreement because those tokens didn't exist until the Consulting Agreement was formed.  I would have ask Mr. Chen to explain how his proxy investing theory worked with regard to the Consulting Agreement which isn't an investment contract.  There is no money put in the Consulting Agreement up front in order for him to obtain these rights.  A number of other questions.  Right?

That was your decision on summary judgement is that the Plaintiffs were on notice of prior breach of the SAFTs because it's in the declaratory judgment action.  The same could not be said for any of these.  As Mr. Miller said, all of these defenses showed up on summary judgment.  Right?  And so that summary judgment after the -- our attempt, you know, our rights to obtain documents through

Request for Admissions, none of which referenced any of these, but did reference extensively, give us the evidence that there were resales under the SAFTs.  Right?  The thing that we had been put on notice of.  We were denied the opportunity to, you know, ask experts about it, get additional experts if needed.

For example, one of these new affirmative defenses which you have heard referenced last Wednesday is that Mr. Wang failed to meet the performance standard under the Consulting Agreement.  Right?

The performance standard under the Consulting Agreement is whether or not -- the question is whether or not Mr. Wang, he agreed under the Consulting Agreement that he would perform his services up to the standard of like professionals in the industry.  Right?  That's an industry standard test, Your Honor.

Plaintiffs have introduced this new defense after the close of expert discovery -- I mean the time for submitting expert reports.  They don't have an expert who can testify to this.  That should make the defense dead on arrival, but if they did have any witness or expert who could testify about this, we may have gotten our own expert to say no, this is how Chinese crypto consultants behave in this industry.  This is the standard to which they are held and Mr. Wang met it.  The time for doing all that has

obviously past.

Mr. Miller admits in his brief they didn't introduce this professional standard until -- not even on summary judgment, they did it in the reply to their summary judgment motion.  Right?

THE COURT:  Let me hear from Mr. Miller or Mr. Palley, whoever wants to address, a final word on this because we now really do have to cut it short.

Mr. Miller, response.

MR. MILLER:  Mr. Palley would like to make a remark with your permission.

MR. PALLEY:  The first thing to remember, Judge, is that performance is an element of their affirmative case. It's not lack of performance.  It is not a defense.  They have to prove this.  And that's always been the case.

Now there is a proposed jury instruction. Hayden, do you want to address this.

MR. MILLER:  To reiterate, the performance standards that Mr. Wines cites is part of their burden of proof.  So the idea that he now admits that an idea, an opportunity to have an expert to prove his burden of proof doesn't get you very far.

The important thing here to take a step back and level set, right, they're arguing that we can't show proof that he breached the Consulting Agreement by reselling

tokens.  This is effectively not just relitigating Footnote 4, this is relitigating the Court's holding, which I'm pointing to ECF 222 at page 13, Injective makes the same argument regarding breach of the lockup provision of the Consulting Agreement as it did for the SAFTs.  As discussed above, that theory entails multiple factual disputes that must be resolved by a jury.

So we already had a motion for summary judgment denied on the grounds that there were factual disputes to whether he resold.  And it would be a little late in the day to use a motion in limine to reconsider that holding, I think.

THE COURT:  Okay.  I think I have all the information that I am going to be able to gather here.  Hold on.  My counsel is giving me something to look at.  Oh, yeah.  I guess one more quick question.  DTX 38 and 48 were skipped at the request of counsel at our Wednesday meeting.  Do we have an update on the status of those?  You asked me to pass on those pending some further opportunity for consideration or discussion perhaps with counsel.

MR. WINES:  38 and which other one, Your Honor?

THE COURT:  38 and 48 I think are the two.

MR. PALLEY:  So for 38 what we would propose doing, and maybe Jim, you and I can talk about this offline.  There are really only two paragraphs in that declaration

that interest us.  We proposed a redacted version of it, paragraph 14 and paragraph -- excuse me, Judge.

I think what would be more effective, Judge, I know you're under the gun here, if we can get back to you at the end of the day.

THE COURT:  Plaintiff, on 38 and 48 if you could, if you could resolve something, so much the better. Tell me where you are on those two and I'll add them to the list to be resolved.

Okay.  I am going to stay on the line at this point for a couple of minutes with Mr. Hawkins.  And you all, I guess that's the only thing that I need from you is that 38 and 48 resolution.  If you can get it to me by the end of the day.

Thank you.

MR. HARTTRAFT:  Your Honor, one quick procedural question.  Regarding our interpreter who will testify regarding the pretext declaration, assuming that can't get resolved, we would like to have her attend by Zoom if that's okay.  Opposing counsel doesn't have any objection.  We just wanted to make sure that was okay with you.

MR. PALLEY:  No objection from us, Your Honor.

THE COURT:  So she will be testifying by Zoom at trial?

MR. HARTTRAFT:  Right.  But I think we said it

was going to be just a few minutes for each interpreter. Rather than fly her all the way out, we thought that would be more efficient.

THE COURT:  I'm for efficiency if it doesn't interfere with the fact finding ability of the jury, and it sounds like it won't.

MR. HARTTRAFT:  Thank you.

THE COURT:  Score one for Zoom.

Okay.  We are -- I think we're ready to adjourn and I will stay on the line for a couple of minutes with Mr. Hawkins.

Okay.  Thank you.

(Court adjourned at 11:48 a.m.)

I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceeding.

/s/ Dale C. Hawkins
Official Court Reporter
U.S. District Court